COLUMBIA MOTOR CAR CO. et al. v. C. A. DUERR & CO. et al.

(Circuit Court of Appeals, Second Circuit. January 9, 1911. On Taxation of Costs, February 8, 1911.)

Nos. 168–170, 173, 174.

**1.** PATENTS (§ 117*)—CONSTRUCTION AND OPERATION — EFFECT OF DELAY IN PATENT OFFICE.

Where an applicant for a patent followed strictly the statutes and rules of procedure of the Patent Office, the courts cannot exact a greater measure of diligence from him, and the fact that he took advantage of the delays which the law permitted him cannot affect the consideration to which his patent is entitled when granted.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 117.*]

**2.** PATENTS (§ 101*)—VALIDITY—COMBINATION CONTAINING UNDESCRIBED ELE-MENT.

A patent is granted for solving a problem, not for stating one, and a claim for a combination which embraces an element only in case it is made capable of being employed in the combination and without dis-closing means of adapting it is invalid as disclosing nothing definite.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 101.*]

**3.** PATENTS (§ 245*)—INFRINGEMENT—EQUIVALENTS.

A constant volume gas engine is not the equivalent of a constant pres-sure engine under a patent entitled to a fair and reasonable, but not a broad, range of equivalents.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 245.*]

**4.** PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—GASOLINE AUTOMOBILE.

The Selden patent, No. 549,160, for an improved road engine, granted in 1895 on an application filed in 1879, claim 1, covers, broadly speaking, a combination of three elements—the carriage, the drive mechanism, and the engine. The first two elements were concededly old, and no novelty is disclosed in them. The engine, described as a "liquid hydrocarbon gas engine of the compression type," was also old; there being at the time of the application two forms of such engine in extensive use—the Brayton, or constant pressure, engine with slow combustion and con-stant flame ignition, operating without explosion, and the Otto, or con-stant volume, explosion engine. The combination itself was not new in an inventive sense, as the Brayton engine had been applied to motor boats and to some extent to vehicles. As thus broadly stated in the lan-guage of the claim, it is void for lack of invention in view of the prior art, but as limited by the specification and drawings, which show an engine of the Brayton type, with certain improvements and adaptations resulting in a decrease in weight and bulk in proportion to the power produced and in increase in speed, the claim discloses invention and is valid as covering a combination embracing as a novel element an im-proved liquid hydrocarbon engine of the Brayton type. As so limited, the claim is not infringed by the modern gasoline automobile in which the engine is of the Otto constant volume or explosion type with electric ignition.

**5.** WORDS AND PHRASES—"CONSTANT PRESSURE ENGINE"—"SLOW COMBUS-TION"—"NONEXPLOSION."

A "constant pressure engine" is one in which the cylinder pressure re-mains the same during the outward travel of the piston while the volume of flame increases. The pressure is applied continuously. This mode of operation is also called "slow combustion" and "nonexplosion."

**6.** WORDS AND PHRASES—"CONSTANT VOLUME ENGINE."

A "constant volume engine" operates in a different manner from a constant pressure engine. The volume during ignition theoretically re-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

mains constant; the pressure increases. The action is spasmodic and is kept in motion by a series of explosions.

Appeals from the Circuit Court of the United States for the Southern District of New York.

Suits in equity by the Columbia Motor Car Company and George B. Selden against C. A. Duerr & Co. and the Ford Motor Company, against the O. J. Gude Company, against John Wanamaker and others, against Société Anonyme Des Anciens Établissements, Panhard & Levassor, and Andre Mossenat, and against Henry & A. C. Neubauer. Decrees for complainants, and defendants appeal. Reversed.

The decrees of the Circuit Court sustained the validity, and found infringement of letters patent No. 549,160 granted November 5, 1895, to the complainant George B. Selden for an improved road engine. The corporation complainant is the exclusive licensee under the patent. The opinion of the Circuit Court is reported in 172 Fed. 923.

Livingston Gifford, Frederic R. Coudert, and Edmund Wetmore (W. Benton Crisp, R. A. Parker, John P. Murray, and Charles K. Offield, on the briefs), for appellants.

Samuel R. Betts, William A. Redding, and Frederick P. Fish (Edward Rector and John W. Peters, on the briefs), for appellees.

Before LACOMBE, WARD, and NOYES, Circuit Judges.

NOYES, Circuit Judge. Although the title of the alleged invention as stated in the preamble of the patent is an "improved road engine," it is claimed to embrace the essential elements of the modern automobile and has been sustained as being "so fundamental and far reaching as to cover every modern car driven in any way by petroleum vapor and as yet commercially successful."

The subject is most important; the interests involved, of great magnitude; the record, phenomenally long; and the questions presented, complex. In examining these questions we have been greatly aided by the work of the judge of the Circuit Court in blazing the way through the mass of testimony and defining the issues to be decided. While we may be unable to adopt the conclusions stated in his very able opinion, we must at the outset acknowledge our indebtedness to it.

Ordinarily the first thing to be looked at in a patent suit is the patent. That is the source and measure of the patentee's rights. But in this case it seems desirable before we examine the patent to take up some preliminary considerations, the disposition of which may serve to indicate the standpoints from which the patent should be regarded in the examination to follow.

This patent was applied for in 1879 and granted in 1895. For over 16 years the application lay in the Patent Office and the applicant took full advantage of the periods of inactivity permitted by the rules and statutes. It is apparent that he delayed just as long as possible the issue of the patent to him. During this long time the automobile art made marked advances along different lines, and when, in 1895, the patent was granted, it disclosed nothing new. Others had then made the patentee's discovery and had reduced it to practice

in ignorance of what he had done. While he withheld his patent, the public learned from independent inventors all that it could teach. For the monopoly granted by his patent he had nothing to offer in return. The public gained absolutely nothing from his invention, whatever it was. From the point of view of public interest it were even better that the patent had never been granted. Judge Hough was quite within bounds in saying:

"No litigation closely resembling these cases has been shown to the court, and no instance is known to me of an idea being buried in the Patent Office while the world caught up to and passed it, and then embodied in a patent only useful for tribute."

It is urged that we should regard unfavorably the patent on account of this delay in the Patent Office, should seek to avoid giving it a broad construction, and should permit the alleged abuse of the law to weigh against the standing of the complainants in a court of equity. But the patentee acted wholly within his rights. He merely took advantage of the delays which the law permitted him. He followed strictly the statutes and rules of procedure, and the courts cannot exact a greater measure of diligence from him. When the patent was granted under the authority of the law, it became entitled to the consideration accorded to any other patent. If the statutes and rules permit unnecessary delays, they should be changed; but we reject the view that this court owes any duty to relieve against their operation. This patent, even if it be useful only for tribute, must be viewed without prejudice and with absolute judicial impartiality.

But, while we should be careful to avoid viewing the patent with disfavor, we should be equally careful to avoid considering it with too much favor on account of its subject-matter. Fifteen years ago hardly any one had seen an automobile. Ten years ago they were rare. To-day they are in use by tens of thousands, and tens of millions of dollars are invested in them and in their manufacture. The development of the automobile has been nothing short of phenomenal, and every one is inevitably impressed with its importance. Consequently, when we see that 30 years ago an application for a patent was filed which even pointed the way to the modern automobile, we can hardly fail to receive the impression that an idea of great importance must have been embodied in it. But, as we shall later see, the development of the automobile was not so sudden as we have thought. It developed step by step at the beginning; the startling activity has come at the end. Moreover, a great idea may be embodied in a patent, and yet the patentee take nothing of value by it. That which he takes is that which he describes and claims. His discovery may be of importance, but he may limit it by his claim, and his claim may proceed in the wrong direction.

So, from any standpoint, we come in this as in other patent causes to the patent in suit in which at its commencement the patentee thus states the object of his invention:

"The object of my invention is the production of a safe, simple and cheap road locomotive, light in weight, easy to control, and possessed of sufficient power to overcome any ordinary inclination."

The patentee then states the difficulties encountered, his manner of overcoming them, and the advantages arising therefrom:

"The difficulties heretofore encountered in the application of steam to common roads are the great weight of the boiler, engine, water, and water tanks, the complicated apparatus necessary to adapt the machine to the roughness of the roads which it must traverse, the necessity of the attendance of a skilled engineer to prevent accidents, and the unsightly appearance of the locomotives built on this plan. I have succeeded in overcoming these difficulties by the construction of a road locomotive propelled by a liquid hydrocarbon engine of the compression type, of a design which permits it to be operated in connection with the running gear, so that the full carrying capacity of the body of the vehicle can be utilized for the transport of persons or goods, and which, by dispensing with skilled attendance and with steam boilers, water, water tanks, coal, and coal bunkers, very largely reduces the weight of the machine in proportion to the power produced and enables me, while employing the most condensed form of fuel, to produce a power road wagon which differs but little in appearance from and is not materially heavier than the carriages in common use, is capable of being managed by persons of ordinary skill at a minimum of trouble and expense, and which possesses sufficient power to overcome any usual inclination."

The patent then describes—as we shall later see with more particularity—the body, wheels, and connections of the vehicle and the engine furnishing the motive power.

The first claim of the patent is the broadest, and the questions of validity and infringement have been presented wholly with respect to it. It is the vital claim in the case and is as follows:

"The combination with a road locomotive, provided with suitable running gear including a propelling wheel and steering mechanism, of a liquid hydrocarbon gas engine of the compression type, comprising one or more power cylinders, a suitable liquid-fuel receptacle, a power shaft connected with and arranged to run faster than the propelling wheel, an intermediate clutch or disconnecting device, and a suitable carriage body adapted to the conveyance of persons or goods, substantially as described."

The defenses are:

(1) That if the patent be broadly construed it is invalid.

(2) That if it be construed less broadly, but according to legitimate rules of construction, the defendants do not infringe.

In considering the validity of the patent, we are met, at the outset, with contentions of some of the defendants that prior uses anticipate, and that that which it discloses is an aggregation rather than a combination. But the questions of novelty and invention often run together, and the inquiry whether a given association of elements is more than an aggregation is only a phase of the question of invention. We shall primarily test the question of the validity of the patent by the answer to the inquiry, whether it discloses the exercise of the inventive faculties in view of the prior art.

This requires an examination of the state of the art in 1879—the date of the application and, consequently, of the alleged invention.[1]

---

[1] The date of the filing of the application—May 8, 1879—is prima facie the date of the alleged invention. The complainants, however, seek to overcome the presumption that that is the date and to carry it back to December, 1877. But, while we have no doubt that the patentee conceived the general idea of the subject of the patent some time before he applied for it, there was no such reduction to practice or description of the whole structure as would

In tracing its development we shall find that the combination described in the claim developed, to some extent, along with its elements. But this was by no means entirely so, and we think that a correct appreciation of the subject can best be obtained by considering:

(a) The development of the elements of the combination;
(b) The development of the combination itself—the motor vehicle.

The claim is for a combination possessing six elements:

(1) "A road locomotive provided with suitable running gear, including a propelling wheel and steering mechanism."

(2) "A liquid hydrocarbon gas engine of the compression type, comprising one or more power cylinders."

(3) "A suitable liquid fluid receptacle."

(4) "A power shaft connected with and arranged to run faster than the propelling wheel."

(5) "An intermediate clutch or disconnecting device."

(6) "A suitable carrying body adapted to the conveyance of persons or goods."

Or, departing from the language of the claim, these are the elements:

(1) The carriage (including the running gear, the body, the propelling wheel and the steering mechanism).

(2) The drive (including the power shaft and connections and the intermediate clutch or disconnecting device).

(3) The engine (including the liquid fluid receptacle).

The claim contains no limitations with respect to the carriage element, and the specification states that the body of the road locomotive "may be of any ordinary or desired form with any number of seats and with or without a top."

Reading the claim by itself, any wheel vehicle for the conveyance of persons or goods would come within its language, and the only limitation the specification could possibly impose upon it would be that the carriage should be of such a type that the engine could be located upon it without obstructing the body or platform.

So, there are no limitations in the claim with respect to the running gear, propelling wheel, or steering mechanism. While the specification and drawings show particular structures, there is no suggestion that the claim is confined to any particular form. Manifestly there was nothing novel in the carriage element.

With respect to the drive element: The claim describes no particular form of power shaft except that it shall be so connected and arranged as to run faster than the propelling wheel. Thus any speed-reducing gear between the driving and the driven shaft would come within the language used. Gearing down to gain leverage under sim-

---

serve to antedate the date of the application. It is true that the patentee made one of the elements of the combination (the engine) some months before he applied for the patent, but he did not make the combination itself (the road locomotive) until many years afterwards, and that is what he claims a patent for. Moreover, we fail to find that any adequate description of the combination claimed was made any substantial time before the application. But, while it is well to fix a starting point, the question between the dates is of little practical importance, as we find no prior use materially affecting the patent between 1877 and 1879.

ilar conditions was, however, old in the art. Mr. Dugald Clerk—the distinguished and very competent witness for the complainants—says:

"It was old in the art for a motive power engine to run at a greater speed than the propelling axle."

The claim likewise imposes no limitation upon the intermediate clutch or disconnecting device, and such devices were old in the art in 1879. They were commonly interposed between stationary engines and the load and had been employed in steam engines; the purpose being the same as here—to permit the engine to run without driving the vehicle. The drive element of the claim was old.

The engine element in the claim is the one which requires the most extended consideration. It is the feature of the patent.

The engine is described in the claim as "a liquid hydrocarbon gas engine of the compression type." Being an engine of this kind, it must, in the first place, be an internal combustion engine, which (using the definitions in the complainants' brief) is an engine in which "the fuel is burned in the engine cylinder and the heat energy thereof utilized by the expanding gases acting on the piston." In the second place, it must be a gas engine, which is "an internal combustion engine wherein the fuel is burned in a gaseous or vaporous condition." In the third place, it must be a liquid hydrocarbon gas engine, which is a gas engine "wherein the gaseous form of fuel is derived from a hydrocarbon liquid, such as petroleum, alcohol, etc." In the fourth place, it must be a gas engine of the compression type, which is "a gas engine using a compressed charge of gaseous fuel," and in which, consequently, the charge-containing space back of the piston will, at the time of ignition, "receive a larger amount of fuel in relation to its size than if the fuel was admitted thereto under mere atmospheric pressure."

Now, gas engines were old at the time of the application for this patent and had been used for various purposes. We shall have occasion to examine their use for propelling vehicles when we come to trace the development of the motor carriage itself. So liquid hydrocarbon engines were in use, both of the compression and noncompression types. The phrase in the claim, "a liquid hydrocarbon engine of the compression type," is descriptive of the Brayton engine, which came into use about 1873, and of the Otto compression engine, which came into use a little later but still was in the antecedent art. The Brayton was undoubtedly the leading compression engine at the time of this application, but it was later superseded by the Otto.

These two engines—the Brayton and the Otto—play important parts in this case. We shall later have occasion to examine them at length and to compare them as belonging to two well-defined types of compression gas engines—the "constant pressure" type and the "constant volume" type. But it is unnecessary to describe them at this time nor to define the terms which we have just employed. It is sufficient now to state the fact that the engine element of the claim—considered as an engine and not necessarily as a part of a combination—was in existence at the date of the alleged invention.

To recapitulate, we have examined the prior art and have found the different elements of the combination, other than the engine, admittedly old. We have also found the engine element old and represented by two types. We must now examine the art with reference to the combination itself and ascertain what, prior to 1879, had been the development of motor vehicles, particularly those for the carrying of passengers and goods.

For some years subsequent to 1830 steam carriages for common roads were used to a considerable extent in England for transporting goods and passengers. But the rapid development of the railroad locomotive as well as the opposition to the use of steam vehicles upon highways soon drove them out of use, so that for many years before the application for this patent steam engines had been used upon highways in this country and in England only for traction purposes.

Gas motor vehicles came later. As we have seen, gas engines were old in the art. The first suggestion of their use to propel road carriages was in 1860 in connection with the Lenoir engine. The Lenoir patent embraced the use of liquid hydrocarbon in the form of vapor, and the engine was successful for stationary purposes. It was a noncompression engine. An illustration published in Paris in 1860 showed a vehicle propelled by this engine, and it was described in various publications. If such a motor vehicle were operated, it undoubtedly ran slowly, and the engine had great weight in proportion to power. But no reason is advanced why the Lenoir engine was not capable of propelling a vehicle.

The Mackenzie English patent of 1865, which the patent itself states was in the prior art, was for the use of steam or "compressed air or other motive power instead of steam" for driving an omnibus or carriage. The structure of this patent included the use of a geared down chain and clutch.

The Savelle French patent of 1867 described how the Lenoir engine could be applied to road vehicles. This patent referred to the difficulty of applying such engines to light carriages.

The Kirkwood English patent of 1874 was for an engine "worked by the explosive force of a mixture of gas and atmospheric air," and which, among other uses, might "be incorporated in the structure of an ordinary tramway car or other vehicle."

The Rosenwald French patent of 1877 was for a carriage propelled by a noncompression gas engine. This vehicle had reducing gears and a clutch or "disentangler." The engine described was of the free piston type and was poorly adapted for use in a road locomotive.

Other patents are shown in the prior art—to Menn, Wilson, and others. But, without examining them or further considering those which we have outlined, it is clear that, if there were nothing more in the case, invention would not be shown in the mere combination of (1) a carriage, (2) a drive, and (3) a gas engine, or even a hydrocarbon gas engine. The elements were old and the combination neither novel as producing any new result nor as showing any new co-operative action.

It follows, then, that, if we are to find invention and novelty in the broad combination of the patent, they must be in the use of a hydrocarbon gas engine of the compression type.

We have seen that hydrocarbon gas engines of the compression type were old in the art and were represented by the Brayton constant pressure engine and the Otto constant volume engine. The inquiry then is whether either of those engines was ever combined with the other elements for propulsion purposes before the application for this patent.

The testimony shows clearly that prior to 1878 Brayton had successfully applied his engine for propulsion purposes in boats. Several launches from 25 to 35 feet in length had been equipped with and operated by them. The evidence, including sketches, shows geared down transmission, the use of disconnecting clutches, and the presence of liquid fuel receptacles. Indeed, if the claim be given the broad construction of covering the use of all compression gas engines, it might be read on the Brayton boat construction—if the words "motor boat" and "boat" were substituted for "road locomotive" and "carriage." Still we appreciate the substantial difference between the problem of propelling a boat and the motor vehicle problem and are not inclined to hold that this use constituted an anticipation, although it may properly be considered in determining the question of invention.

It also appears that about 1874 Brayton used one of his engines to propel a street car upon a trial track near the city of Providence. The car was propelled back and forth over the half-mile track, and it also ran up a slight grade. Some passengers were carried. There were reversing and disconnecting devices. The engine was large and heavy in proportion to the power which it furnished and—an accident taking place—it was not long used. More power in proportion to weight was necessary for commercial street railway purposes, and the plan of installing these engines was given up; financial considerations entering into this determination. But, although the experiments did not develop a commercial success, they were successful from a mechanical standpoint. The engine ran the car considerable distances and carried passengers. This use was not an abandoned experiment but an abandoned attempt to induce the railway company to equip the cars with the Brayton engine. The perfected structure was capable of practical use, although there was much room for improvement. It was not embryotic or inchoate. The combination of the engine, the drive, and the carriage was used in public, and thereafter it required the use of the imitative, and not of the inventive, faculties to claim, without modification, the same combination. The use of the engine in one vehicle pointed directly to its use in another vehicle.

The Brayton engine was also used upon an omnibus in 1878. The weight of the testimony is that the omnibus was run by the engine a very short distance, but the experiment cannot be regarded as having been either mechanically or commercially successful. This use will not be considered as in the antecedent art.

In the state of the art thus disclosed the patentee filed his application for a patent. As we have seen, he claimed broadly the combination of a "liquid hydrocarbon gas engine of the compression type" with the other elements. It is true that in the specification and draw-

ings he described and showed a particular type of engine, but he also said:

"Any form of liquid hydrocarbon engine of the compression type may be employed in my improved locomotive."

Taking the patent according to its terms, the case apparently presented is the ordinary one in which a patentee claims a broad invention and describes what he considers to be the best mode of applying it, but is not confined to that method. And if the prior art permitted such a patent in this case it might well be that it would be valid. But the prior art did not permit such a patent. Every element in the claim was old, and the combination itself was not new. Combinations of noncompression gas engines with the other elements had been in use, and Brayton had employed a "liquid hydrocarbon engine of the compression type" in a vehicle.

Even if the Brayton uses were not precisely anticipatory, we can reach no other conclusion than that with them in the prior art the claim in question must be held invalid for want of invention if it be given the broad construction the language apparently calls for. Moreover, if we give it a slightly narrower construction and treat it as covering the selection of the Brayton type of compression engine, the same conclusion must be reached. Invention would not be involved in the mere choice of that type of engine, for Brayton had previously made the same selection for his street car and boats. And, even if the Brayton engine had been used only for stationary purposes, it is by no means certain that its mere selection for incorporation in a motor vehicle without adaptation would have involved invention.

In re Faure's Appeal, 52 Off. Gaz. 754 (Supreme Court, District of Columbia), is in point. In that case Faure claimed a patent for the combination of an electric motor with a vehicle. It appeared in that case, as in this, that boats had been propelled by the same kind of motor. The court said (page 756):

"It is made evident that the mechanical arrangements for applying the power are not new, being familiar to all experts; and that the result is not new, viz., the movement of vehicles by electrical storage batteries. It is admitted that Trouve had propelled boats in this way. The contention that such a use did not anticipate this application because that experiment was on water and this invention is designed for use on land seems untenable. The propulsion of vessels through water by such batteries is within the same principle as locomotion on land."

In Shaw Electric Co. v. Worthington (C. C.) 77 Fed. 992, 993, the patent was for an improvement in traveling cranes through the substitution of independent electric motors for the power previously furnished by steam power. Judge Acheson said:

"The facts, then, being as above stated, what element of invention is to be found in the patent here in suit? In view of the previous employment of electric motors in propelling street cars, driving machinery in mills, working elevators, etc., the mere application of electric motors to traveling cranes certainly did not involve invention, even had Shaw been the first to operate cranes electrically. The inventive faculty was no more exercised here than in a multitude of other instances in every branch of industry where the electric motor has been substituted for the steam engine or other source of power."

Indeed, Mr. Clerk, himself, says:

"I have already stated that if the Lenoir, Brayton, Otto, and Langen, and Otto Silent motors were all supposed to be in active existence and running, doing stationary work, that the mere selection of one of these motors without alteration and the application of any one of them without alteration of any kind would not involve an act of invention."

It must be distinctly borne in mind that we are not now considering the alteration of any engine for the purposes stated in the patent; the question of the superiority of a combination embracing a modified or reorganized engine, or the invention involved in making it. We are, for the time being, taking the claim as it reads in connection with the broad statement in the specification, and we conclude that, taken in that way, invention is not disclosed. It should also be observed that this conclusion is not inconsistent with a holding that the patent is valid upon its face. The antecedent art as shown by the testimony goes far beyond that disclosed by the patent or that of which the court could take judicial notice.

But we are reluctant to so construe the claim that it must be held invalid for want of invention. We are of the opinion that the patentee had ideas ahead of the times and appreciated many aspects of the problem to be solved in creating a practical motor vehicle. Reading his statement of the difficulties encountered, his manner of meeting them, and the advantages of his discovery, we think it evident that he understood that an engine suitable for a light vehicle could not be taken bodily from the prior art and used without change, but that modification and adaptation were required. In our opinion the statement in the patent that any form of compression engine may be employed is inconsistent with the intention disclosed by the patentee in the patent as a whole and should not have too much stress laid upon it. We also think that we should examine the specification, including the drawings and the model, to determine whether the patentee in addition to expressing the need of adapting an engine to the purposes of a motor vehicle shows that he actually adapted one. It may well be that the claim as limited by the specification should be held to be valid.

As already shown, the patentee states at the commencement of his patent that the object of his "invention is the production of (1) a safe, (2) simple and (3) cheap road locomotive, (4) light in weight, (5) easy to control, and (6) possessed of sufficient power to overcome any ordinary inclination."

He then, as shown in the extract from the patent quoted at the beginning of this opinion, points out the difficulties involved in the use of steam engines upon common roads, and states that he has overcome them by his road locomotive propelled by his liquid hydrocarbon engine of the compression type.

He next states that the advantages of his invention are:

(1) Dispensing with steam boilers, coal, and water, and the structures necessary to their use, and employing a condensed form of fuel, thereby reducing the weight of the machine in proportion to the power produced;

(2) Producing a power road wagon light in weight, capable of being managed by persons of ordinary skill, and having sufficient power for ordinary purposes.

The patentee also describes with reference to the drawings the body of the road locomotive, the driving wheels, the clutches, the gearing, the springs, the fifth wheel, the steering device, the brake, and other parts of the structure and also indicates the preferable location of various devices and preferable methods of connection.

The patentee describes with reference to the drawings the engine element, pointing out (1) the air reservoir, (2) the air pump, (3) the working cylinder, (4) the inlet valve, (5) the cam shaft, (6) the combustion chamber, and other details. He also briefly describes the operation of some of the different parts. The description, however, both of the construction and operation of the engine, is quite incomplete. This was appreciated by the patentee, for he concluded his description by saying:

"As the general construction and mode of operation of liquid hydrocarbon engines of this class are well known, it is considered unnecessary to further describe them here."

As the patentee thus refers to the existing art for a more complete description of his compression engine, and as we have ascertained that there were two different types of compression engines in the art represented respectively by the Brayton and Otto engines, we must now find what those types were in order to determine which the patentee selected.

The two types are called respectively the "constant pressure type" and the "constant volume type." Although these terms may have originated since the date of the invention, they correctly describe the types or classes of compression engines then in existence. No better explanation of them can be found than in Mr. Clerk's work entitled "The Gas Engine," which was published in 1887 and which has been offered in evidence. In this book he also shows the construction and working processes of the two types of engines and the differences between them, as stated in the footnote.[2]

[2] In his book (page 29) Mr. Clerk divides gas engines according to their work processes into three well-defined types:

"1. Engines igniting at constant volume, but without previous compression.

"2. Engines igniting at constant pressure with previous compression.

"3. Engines igniting at constant volume, with previous compression."

It is not necessary for the purposes of this case to examine the operation of the first type—the noncompression engine. With respect to the second type, the constant pressure compression engine, Mr. Clerk says (page 31):

"In it the engine is provided with two cylinders of unequal capacity. The smaller serves as a pump for receiving the charge and compressing it; the larger is the motor cylinder, in which the charge is expended during ignition and subsequent to it.

"The pump piston, in moving forward, takes in the charge at atmospheric pressure; in returning compresses it into an intermediate receiver, from which it passes into the motor cylinder in a compressed state. A contrivance similar to the wire gauze in a Davy lamp commands the passage between the receiver and the cylinder, and permits the mixture to be ignited

It is apparent from the descriptions in this work that a "constant pressure engine" is one in which the cylinder pressure remains the same during the outward travel of the piston while the volume of flame increases. The pressure is applied continuously and not spasmodically. This mode of operation is also called "slow combustion," and "nonexplosion."

A constant volume engine operates in a different manner from a constant pressure engine. The volume during ignition theoretically remains constant; the pressure increases. The action is spasmodic. The piston moves by explosive action and is kept in motion by a series of explosions.

The Brayton engine, to which we have referred, was a constant pressure compression engine. Mr. Clerk said in his book (page 32) that it was one of the most successful of that kind, and also said (page 154):

"The engine worked well and smoothly; the action of the flame in the cylinder could not be distinguished from that of steam; it was as much within control and produced diagrams quite similar to steam."

And in Prof. Thurston's contemporaneous report (1873) concerning the Brayton engine, quoted in Mr. Clerk's book (page 157), it is said:

"The operation of the engine is precisely similar in the action of the engine proper and in the distribution of pressure in its cylinder to that of the steam engine. The action of the impelling fluid is not explosive, as it is in every other form of gas engine of which I have knowledge."

The Otto engine, on the other hand, was a constant volume compression engine. Although the leading idea of compression and ignition at constant volume had been suggested before the time of this

on the cylinder side as it flows in without the flame passing back into the receiver.

"The motor cylinder thus receives its working fluid in the state of flame, at a pressure equal to, but never greater than, the pressure of compression. At the proper time, the valve between the motor and the receiver is shut, and the piston expands the ignited gases till it reaches the end of its stroke, when the exhaust valve is opened, and the return expels the burned gases.

"The ignition here does not increase the pressure, but increases the volume. The pump, say, puts one volume or cubic foot into the receiver; the flame causes it to expand while entering the cylinder to two cubic feet. It does the work of two cubic feet in the motor cylinder, so that, though there is no increase of pressure, there is nevertheless an excess of power over that spent in compressing."

With respect to the constant volume compression engine, Mr. Clerk says (page 33):

"The compression cylinder may be supposed to take in the charge of gas and air at atmospheric temperature and pressure; compress it into a receiver from which the motor cylinder is supplied; the motor piston to take in its charge from the reservoir in a compressed state; and then communication to be cut off and the compressed charge ignited.

"Here ignition is supposed to occur at constant volume, that is, the whole volume of mixture is first introduced and then fired; the pressure therefore increases. The power is obtained by igniting while the volume remains stationary and the pressure increases.

"Under the pressure so produced, the piston completes its stroke, and upon the return stroke the products of the combustion are expelled."

engine, Otto seems to have first successfully applied it, and his engine came into general use. This engine was operated by a series of timed explosions and, as we shall later see, was the prototype of the modern automobile engine.

It is clear from this examination that the statement heretofore made that the Brayton and Otto engines differed in being respectively constant pressure and constant volume engines is sustained by the record.[3]  They also differed in another important particular. The Brayton was a two-cycle engine. The Otto was a four-cycle engine. Turning to the complainant's definitions, we ascertain that "a cycle is a series of movements composing one complete operation," and that the following is a definition of the term "two-cycle engine":

"An engine whose operation is completed by two strokes, viz., a power stroke and a scavenging or exhaust stroke. If of the compression type the power stroke simultaneously compresses the charge for the next power stroke, the charge thus compressed being admitted to the cylinder at the end of or during the scavenging or exhaust stroke."

The term "four-cycle engine" is thus defined:

"An engine whose operation is completed in four strokes. Always of the compression type. First stroke sucks in the gaseous charge at atmospheric pressure; second stroke compresses the charge; third stroke is the power stroke; fourth is the scavenging or exhaust stroke."

The compression stroke in the two-cycle engine of the earlier art usually compressed the charge into an intermediate receiver from which it was admitted in a compressed state to the cylinder. This was the construction of the Brayton engines which were provided with outside mechanism in which compression took place before the charge was let into the cylinder. The four-cycle engine, on the other hand, as represented by the Otto engine, had no such intermediate receiver. The single cylinder served alternately the purposes of motor and pump, and the charge was also compressed in it.

Now, as the patentee in effect referred to an existing compression engine to supply the deficiencies in his description, and as the two existing types are represented by the Brayton and Otto engines respectively, the question is: Which one did he refer to?

Comparing the engine drawings of the patent in suit with the Brayton patent drawings, we think it evident that the patentee adopted, and perhaps, adapted, the Brayton apparatus. Looking at the written specification, it will be seen that an external air reservoir and pump are provided, showing that the engine was of the Brayton two-cycle type. Reading further we observe that the patentee says:

"As it would be decidedly inconvenient to be under the necessity of extinguishing the flame in my improved traction engine whenever it was required to make a short stop, the clutch, Y (or the clutches, 'j j') is interposed between the engine and the driving wheels, so as to admit of the running of the engine while the carriage remains stationary."

This constantly burning flame (or other continuous ignition) was necessary to the operation of the Brayton constant pressure engine.

---

[3] We shall continue the examination of the differences between these engines when we consider the question of infringement.

It was the "living torch at the entrance of the cylinder" referred to in the Brayton patent. Its existence was not essential to the timed explosion operation of the Otto engine.

So without any expert opinion we should have no difficulty in determining that the engine of the patent is of the Brayton two-cylinder constant pressure type. And the testimony even of the complainants' expert is to the same effect. Mr. Clerk said in his testimony that the reference in the patent to existing well-known engines was to the Brayton constant pressure engines.

He also said in his report to complainants' counsel, after referring to the description in the patent:

"Stopping at this point it is necessary to recognize what type of engine is indicated. About this I have no difficulty whatever. I at once recognize it as an engine of the Brayton type operating on the constant pressure cycle. Although no description is given in the specifications, any one familiar with Brayton engines can see the air pump of smaller capacity than the motor cylinder; the air reservoir containing air compressed by the pump, and the inlet valve admitting air to the cylinder. * * * Altogether I have no difficulty in seeing that the intention of the inventor is to operate by the constant pressure method, although he does not say so specifically."

It cannot therefore be questioned that the engine which the patentee referred to in the patent for the completion of his description was the Brayton engine. The Brayton mode of operation was adopted by reference as the Selden mode of operation, and this method, as we have already seen, was the constant pressure, two-cycle method.

The next question is: What modifications does the patent show that Selden made in the Brayton engine?

The Brayton patents and the testimony concerning the actual Brayton engines show that they were heavy and cumbersome in proportion to the power furnished. While such an engine did run a street car, it occupied considerable space, and a still larger and heavier engine would have been necessary to furnish sufficient power for the practical needs of the railway. The engines were poorly adapted for use in a vehicle upon common roads. When capable of furnishing sufficient power they were too heavy, and the reciprocating parts occupied too much space.

The written description of the patent, read in connection with the drawings, shows fairly that Selden made material improvements upon the Brayton structure in order to adapt it to the purposes of a road vehicle.

1. The drawings show that the Selden engine has an inclosed crank chamber; it being a continuation of the working chamber. It is true that the only function of the inclosed crank case mentioned in the written specification is that of a cooling chamber. But it is referred to and it is clearly shown in the drawings, so that we think the patentee entitled to claim as a feature of his patent any benefits necessarily accruing from its use. We are also satisfied that the use of the inclosed crank case rendered unnecessary the heavy bed plates of the former Brayton construction and enabled the patentee to dispense with other heavy and cumbersome parts outside the casing of the cylinder.

2. We also think it is the better view that Selden by his alterations increased the speed capabilities of the Brayton engine. Higher speed was obviously necessary for the purposes of a light road vehicle, and it was such a vehicle that it was the object of the patent to produce. The elimination of cumbersome working parts by the use of an inclosed crank case necessarily increased, to some extent, the capacity for speed. The plurality of cylinders referred to, but not required by, the specification and shown in the drawings, produced, in the arrangement shown, continuous turning power and increased the speed possibilities over the old Brayton construction. The gearing ratio—the proportion of stroke to volume of cylinder—shown in the drawings, but not mentioned in the written specification, also gave increased speed.[4]

The improvements, then, which Selden made in the Brayton engine, had these results:

(a) Decrease in weight in proportion to power produced.

(b) Decrease in bulk in proportion to power produced.

(c) Increase in speed.

To make these improvements we think that something more than mere mechanical skill was required, and, in view of the superior efficiency of the engine for the purpose for which it was designed, we hold that invention was involved. The complainants are probably right in saying in their brief:

"He (Selden) was compelled to materially reorganize the Brayton engines of the prior art even to such an extent that a separate engine patent would have been fully justified by the degree of invention involved."

Selden did not, however, obtain a patent for his improvement upon the Brayton engine, but made the improved engine an element in his road locomotive combination. But no new co-ordinate action of the members of the combination is shown. The improved engine furnished the power, and the other elements co-operated with it in the same way that similar elements had co-operated with the older engines. The superior results would seem to have arisen from the superiority of the engine element alone. But it is not necessary to determine whether the associated action, as such, produced a new and useful result. It is sufficient to sustain the claim to hold that the combination embraced a novel element. The claim is held to be valid as covering a combination in a road locomotive of the different elements with a liquid hydrocarbon compression engine of the Brayton type;

---

[4] The rule is, of course, appreciated that while the drawings of a patent serve to make plain doubtful or ambiguous statements in the written description, they cannot go further and supply the entire absence of the written description required by the statute. A strict application of this rule would probably prevent us from considering what the drawings show concerning the gearing ratio or the working of the cylinders—these subjects not being mentioned in the description. But in view of the stated objects of the patent and in view of the fact that changes in the Brayton structure referred to in the description tend to increase speed capabilities, we have thought that the rule should not be strictly applied in this case and that some weight should be given to what the drawings disclose in that direction, as supplementing the written description and not altogether as supplying its absence.

the limitation to this type being read into the claim by the specification to save it from invalidity.

It must be understood, however, that we do not sustain the claim upon the theory that Selden invented a light engine, an engine of small bulk, or an engine of high speed, using those terms absolutely. We have made comparisons with, and have considered improvements upon, the Brayton engines only. Compared with them, we think the Selden engine lighter, less bulky, and of higher speed. But we are not at all convinced that the Selden engine operating according to the Brayton or constant pressure method would be a high speed engine as compared with one operating according to the explosive method. Constant pressure involving slow combustion seems consequently to involve slow operation.

The complainants urge that it places too narrow a construction upon the claim to limit it to a combination of which the engine is an improved Brayton engine. They say that the improvements upon the Brayton engine which Selden shows in his patent merely illustrate the alterations and changes required by compression engines generally to fit them for the purposes of a light road vehicle. They say, in effect, that the engine element of the claim is any compression engine which has been adapted to vehicular purposes by changes similar to those made in the Brayton engine.

But we have been able to find that Selden reorganized the Brayton engine only by making close comparisons with that particular construction. We have nearly broken established rules by looking at the drawings by themselves to ascertain the changes made in that engine. There is little enough to be found about the improvements to it and nothing at all about the alterations of other engines. The patent does not pretend or attempt to lay down any rule for reorganizing compression engines to fit them for vehicular purposes. It does not say that other kinds of engines than the Brayton type require changes. It does not say that the changes made in the Brayton engine could be made in other engines, or that, if made, they would fit them for use in motor vehicles. No one could learn from the patent whether the Otto engine could be constructed with an inclosed crank chamber, or whether the substitution of the gearing ratio shown in the drawing would increase or diminish its speed. With the patent before a person skilled in the art, experiments, certainly, and invention, not improbably, would have been necessary to determine the steps required to reorganize the Otto engine.

A patent is granted for solving a problem, not for stating one. Its description must explain the invention itself, the manner of making it, and the mode of putting it in practice. In the absence of knowledge upon these points, the invention is not available to the public without further experiments and further exercise of inventive skill. A claim for a combination which embraces an element only in case it is made capable of being employed in the combination and without disclosing means of adapting it discloses nothing definite. The questions remain: What engine is capable of being combined in a road vehicle? What changes are necessary to adapt it to the purpose? How are these changes to be made? If we were to construe the claim

as the complainants urge, we should be obliged to go further and hold it uncertain, indefinite, and consequently invalid.[5]

For these reasons, we must hold that the claim of the patent, limited by the specification in the manner shown, is valid unless, indeed, we are satisfied that the patented structure was inoperative and without utility. But, without discussion, it is sufficient to say that we have no doubt that an engine constructed according to the teachings of the patent with its references to the Brayton engine would, in combination with the other elements, run a road vehicle. We think that the patent discloses an operative structure, and that is sufficient. The defense of want of utility is not sustained. But any contention that a motor vehicle constructed by the patentee according to the teachings of the patent operated so successfully as to demonstrate that Selden had solved a great problem and is entitled to the status of a pioneer inventor is, we think, without foundation.[6]

We now come to the question of infringement, and as it is conceded that the defendants use a combination embracing all the elements of the claim other than the engine element, and as it is also conceded that they use an engine of some kind in connection with such other elements, the question of infringement resolves itself into the inquiry whether their engine is a modified Brayton engine or its equivalent.[7]

[5] Any force whatever in the complainants' contention must grow out of the presence in the patent of the statement to which attention has already been directed that "any form" of compression engine may be employed. But, just as we found that by giving those words their natural meaning, the patent would be made so broad and sweeping as to be invalid in view of the antecedent art, so, if we construe them as meaning "any adaptable engine" or "any engine which has been adapted," we make the patent indefinite and invalid. If the patent is to be sustained, the language in question must be given a limited application. Under all the conditions we think that it should be construed as meaning merely that the patentee does not confine himself to any particular form or detail of the Brayton type of engine.

[6] While the testimony with respect to the Selden vehicles constructed to illustrate the patent is sufficient to negative inoperativeness, it fails to show such practical success as to broaden the scope of the invention, and certainly does not disclose invention in and of itself. We should be unable to sustain the patent upon any such theory as that advanced by the complainants' experts that Selden's invention consisted in producing "a successfully operative vehicle" or "as a new result," "a practically unobstructed vehicle capable of great range of action." Of course, the vehicle had to be successfully operative in the sense of showing utility to make the patent valid, but that result did not show invention and novelty. Those essentials we were able to find only elsewhere. Moreover, the result of obtaining a practically unobstructed vehicle arose from the location of the engine upon the axle which the defendants have not adopted, and that feature is not put forward in the complainants' briefs as being essential to the invention. And, furthermore, we are not at all convinced by the testimony concerning the vehicles in question—even assuming that their construction followed the teachings of the patent and nothing besides—that they showed capability for commercial use or possessed great range of action.

[7] A distinction is made by the Judge of the Circuit Court in considering the question of infringement which, we think, is not well founded. He says in his opinion:

"Defendants seem continually to assume (without saying so) that Selden invented nothing more than a modified Brayton engine and then assert that

But before we enter directly upon this inquiry we should briefly examine the development of the modern automobile and ascertain from what source the engines of the defendants' type were obtained, and, especially, whether they were borrowed from Brayton and Selden.

We have already noticed the motor vehicles of the art prior to 1879. Much had been attempted and little accomplished. Indeed it was not until about 10 years later, at the time of the Paris Exposition of 1889, that the real automobile art may be said to have begun. At that exposition a Benz automobile was exhibited, and later the public interest was stirred by the Paris-Rouen race. In this country public attention was first called to the automobile by the Daimler Exhibit at the Columbian Exhibition in Chicago in 1893, and in 1895 the Times-Herald automobile race took place in Chicago. The pioneer inventors appear to have been Daimler and Benz abroad and Duryea, Olds and Ford (and perhaps one or two others) in this country.

These inventors selected for their automobiles the Otto compression engine. They did not select the Brayton engine and, indeed, as Mr. Clerk says, the Brayton engine had practically disappeared from the market in 1889. Thus in their original type of engine they borrowed nothing from Brayton, and, of course, they could have actually borrowed nothing from Selden because his patent was not issued until 1895.

In some of the first automobiles the engine was located on the axle as shown in the Selden patent. But this location below the springs caused too much jar to the machinery and was soon abandoned.

The Otto compression engine selected by these inventors has been modified and changed in its development into the modern automobile engine and adjuncts of importance have been added. But none of these changes was in fact taught by the patent in suit, nor could many of them have been taught by it had it been issued. And the possible changes which it did indicate were suggestive merely.

they do not infringe because they do not use that particular motor and do use a modified Otto. They admit that the claim is for a combination, but continually seek refuge in defenses that would be good against any patent on Selden's engine, but are worthless against the combination if it be patentable at all."

Undoubtedly a patent upon a combination may be broader than a patent upon any or all of its elements. The members may co-operate to produce a new and beneficial result or operate according to a novel method. But it is not clear that any novel co-operative action is shown in the present case and whatever new and beneficial result was produced by the combination seems clearly to have arisen from the superiority of the engine element alone. It has seemed well settled in the case that that which the patentee invented and used in his combination was a modified Brayton engine. There would have been no invention in combining an unmodified Brayton engine with the other elements.

But all this is beside the question of infringement. Even if it be conceded that the combination patent has a different scope than a patent for an improved Brayton engine would have had, it is none the less true that, if the defendants do not use the modified Brayton engine and do use the modified Otto engine, they escape infringement unless the latter is an equivalent of the former. It is well settled that to establish the infringement of a combination the use of every element of the combination must be shown.

The Otto compression engine did not at first employ electric ignition. A flame with a moving slide produced the timed explosions. Electric ignition was considered impracticable. But when the electric art had developed it was seen that the electric ignition could be made superior to flame ignition and would permit much higher speed. But the change was not indicated by the Selden patent, which refers only to flame ignition.

The inventors added a carburetter to the Otto engine in which the charge of gasoline and air was mixed in exact proportions before it was conducted to the cylinder for compression. In the engine of the patent the air vaporizes the gasoline in the passage leading to the cylinder, and the proportions necessarily vary. The patent in no way pointed in the direction of the carburetter.

When the inventors began to adapt the Otto engine to the purposes of a road engine, the desirability of lightness was apparent, and changes were made in the bed and castings so that the engine could be supported upon a steel frame instead of upon the heavy foundations used in stationary work. Other changes in the direction of decreasing weight and bulk and increasing speed were made. But these inventors were actually taught nothing in these matters by the Selden patent, and if it had been before them they would, as we have seen, have learned nothing definite from it.

We thus find that the defendants use an improved Otto engine which retains the principle of that type and is, in its essentials, a four-cycle constant volume (or explosion) compression gas engine. Obviously it is not identical with Selden's improved Brayton engine, which is a two-cycle constant pressure (or slow combustion) compression gas engine; and so the final question is whether they are, under the patent, equivalents.

It is, of course, clear that an inventor is not limited to the particular structure illustrated in his patent as the best form known to him provided his claim is broad enough to cover other or equivalent forms. If the claim in the present case could have been sustained as covering a combination of any hydrocarbon gas engine of the compression type with the other elements, the description in the specification of the modified Brayton engine would have been considered as a statement of the inventor's idea of the best form; but he would not have been confined to it, and the Otto improved engine would unquestionably have infringed. But we were unable to sustain the claim as so construed and could only hold it valid as being limited to a combination in which a Brayton modified or reorganized engine should be a member. The patent as so construed necessarily permits only a very limited range of equivalent forms. Being confined to an engine element of a particular class or type, an engine of another class seems almost barred by the interpretation itself. Still, classification might be based upon matters of form and not of substance. The elements of the combination are things and not names. In this as in other patents for combinations we think that the unity of the combination will not be affected by the substitution of elements which, however they may be classified or designated, perform the same function in substantially

the same way, while it will be destroyed by the substitution of elements which do not perform the same office in substantially the same manner.

We must then consider the materiality of the differences between the engines in question. We have already seen that broad differences exist and must now determine their nature and extent. In giving weight to dissimilarities—in saying what are substantial and what relate merely to form—we must consider the degree of invention shown in the patent, although we will be unable to disregard differences as in the case of a patent of a primary character. And we think this means in the present case that the patent is entitled to a fair and reasonable, but not broad, range of equivalents. What is a fair and reasonable range can better be determined in the concrete comparison rather than in the abstract definition.

A close comparison of the engines shows many differences. Some are obviously mere differences in shapes and designs and may be at once disregarded. The following are those which appear to be the most material:

(1) The Selden engine has external compression mechanism with a compressed air reservoir, while the defendants' engine has no such external mechanism but compacts the charge in the working cylinder. Were the compression of the charge the only object to be accomplished, undoubtedly the gas and air could as well be compressed to the requisite degree before entering the cylinder as by compression in the cylinder itself. And even if internal compression gave superior results it is probable that the one method would be the equivalent of the other. But if and in so far as outside compression is essential to a constant pressure engine, inside compression cannot be regarded as its equivalent unless we determine that the distinction between constant pressure and constant volume engines should be disregarded.

(2) The Selden is a two-cycle engine. The defendants' engines are four-cycle. The Selden engine compresses into an outside chamber simultaneously with its power stroke and with the next stroke drives out the burnt gases. Every second stroke is a power stroke. The defendants' engine draws in the charge with the first stroke and compresses with the second. The third stroke is the power stroke, and the fourth sweeps out the burnt gases. Every fourth stroke is a power stroke. But the first two strokes of the defendants' engine are merely pumping and compressing strokes, and, were the question here between a two-cycle explosion engine and a four-cycle explosion engine, we should have little difficulty in finding the one the equivalent of the other.

(3) The Selden engine burns the charge as mixed at the entrance to the cylinder, while the defendants' engine compresses and mixes the charge inside the cylinder. The result in the latter case is that by th compaction in the cylinder after admission the mixture is brought into a homogeneous state, while in the former case the gas and the air burn at the inlet to the cylinder in a more or less nonhomogeneous state with the pressure behind them. The materiality of this difference in operation, however, lies in the fact that the one form is that

of the constant volume engine; the other, of the constant pressure engine.

(4) The Selden engine has no distinctive external vaporizing device, while, as we have seen, the defendants' engine is equipped with a carburetter which determines the proportions of the mixture to be admitted to the cylinder and also increases its homogeneity. But by the construction shown in the patent the air vaporizes the hydrocarbon in the passage leading to the cylinder, and we think the carburetter, while undoubtedly an adjunct of great importance and advantage, should be held not beyond the range of equivalents.

(5) The Selden engine has constant flame ignition, while the defendants' engine has timed electric ignition. Probably continuous electric ignition would be the equivalent of constant flame ignition; but whether intermittent or timed ignition, which is an essential feature of the constant volume engine, is the equivalent of continuous ignition, depends altogether upon whether the constant volume engine is the equivalent of the constant pressure engine.

So, lastly, we reach the question: Is the constant volume engine the equivalent of the constant pressure engine, under a patent entitled to a fair and reasonable, but not broad, range of equivalents?

This is not a question of differences in terminologies or theories. It is a question of differences in principles and things. It is wholly immaterial whether the terms "constant pressure" and "constant volume" were in use when the patent was first applied for, or when or by whom they were first employed. It is equally immaterial whether we use those terms at all. We might just as well use the terms "explosion" and "combustion" to designate the two tpyes, and, indeed, have repeatedly used them in this opinion. But the terms "constant pressure" and "constant volume" are convenient phrases which in themselves indicate methods of operation and they are used in Mr. Clerk's book to which we have referred and shall refer. So, although laying no stress whatever upon the mere names, we shall continue to use them.

It is also immaterial that by omitting the bye-pass which furnishes a constant supply of gas, by changing the timing of valves, and by using timed ignition, a constant pressure engine might be converted into a constant volume engine. The required alterations are by no means trivial, and the actuality of differences in principles and methods is not changed by the readiness by which they may be eliminated.

There is another matter which is also without importance. It is immaterial that a constant volume engine, under extraordinary conditions and with unusual adjustments, may be made to approximate the action of a constant pressure engine, or that a constant pressure engine under like conditions and adjustments may be made to approximate the action of a constant volume engine. The question is whether in their regular methods of operation the two types of engine are so similar as to be substantial equivalents.

Turning again—with the risk of repetition—to Mr. Clerk's book, we find that, in addition to his classification of compression engines as

shown in the extract already quoted, he says, in speaking of the constant pressure type (page 152):

"In engines of this kind compression is used previous to ignition, but the ignition is so arranged that the pressure in the motor cylinder does not become greater than that in the compressing pump. The power is generated by increasing volume at a constant pressure. Engines of type 2 (constant pressure engines) are therefore:

"Engines using a mixture of inflammable gas and air compressed before ignition and ignited in such a manner that the pressure does not increase; the power being generated by increasing volume.

"These engines are truly slow combustion engines; in them there is no explosion.

"The most successful engines of the kind is an American invention; although proposed in 1860 by the late Sir William Siemens, it was never put into practicable workable shape till 1873, when the American, Brayton, of Philadelphia, produced his well-known machine."

And of his type 3, or constant volume type, Mr. Clerk further says (page 165):

"Engines of this kind resemble those just discussed in the use of compression previous to ignition, but differ from them in igniting at constant volume instead of constant pressure; that is, the whole volume of mixture used for one stroke is ignited in a mass instead of in successive portions.

"The whole body of mixture to be used is introduced before any portion of it is ignited; in the previous type (constant pressure type) the mixture is ignited as it enters the cylinder, no mixture being allowed to enter except as flame. In type 3 the ignition occurs while the volume is constant; the pressure therefore rises; it is an explosion engine, in fact, like the first type (noncompression) but with a more intense explosion due to the use of mixture at a pressure exceeding atmosphere. * * *

"In the third type are included all engines having the following characteristics, however widely the mechanical cycle may vary:

"Engines using a gaseous explosive mixture, compressed before ignition and ignited in a body, so that the pressure increases while the volume remains constant. The power is obtained by expansion after the increase of pressure."

Mr. Clerk considered these differences between constant pressure and constant volume so important that he made them the basis of classification in his book, and, notwithstanding his present testimony, we must regard them as substantial.[8]

It is true, as stated in the opinion of the judge at circuit, that in all internal combustion engines the result of expanding in any way the gaseous fuel is the driving of the piston; but the method of operation is not the same when it is driven by explosive action as when it is driven by slow expansion. So in all compression gas engines the charge is compressed before ignition; but the compression of the whole charge and its instantaneous firing at the moment of greatest compaction is a very different thing from the ignition of successive compressed portions—particle after particle—as they enter the cylinder. In the latter case the force upon the piston is progressive—"the action of the flame in the cylinder could not be distinguished from that of steam" (Mr. Clerk's book, page 154)—while in the former the

---

[8] Mr. Clerk uses the word "type" in his book in the sense of "kind" or "class." Thus he points out several different varieties of the different classes of engines. As we have quoted freely from the book, we have, to avoid confusion, used the same word in the same sense.

force is spasmodic and explosive. These are differences in principles and methods of operation. And these differences in principles and methods are substantial. We are satisfied that the slow combustion method necessarily involves slow operation; not only because of the time required for combustion between strokes, but on account of the comparatively nonhomogeneous character of the mixture. We are also satisfied that it gives less power in proportion to the size of the engine than the explosion method.[9]

It is our opinion, for these reasons, that in this road locomotive combination embracing as its engine element an engine of the constant pressure type, the substitution in place of such engine of an engine of the constant volume type destroys the unity of the combination, because the two engines do not perform the same functions in substantially the same way. Granting the patent as broad a range of equivalents as its interpretation will permit, and giving due consideration to the degree of invention involved, still we are not able to hold that the Otto improved engine is the equivalent of the Selden engine or that the defendants infringe by employing it as an element of their motor vehicle combination.

Let us briefly notice the consequences of an opposite conclusion. The Otto engine was in the prior art. Assuming that it was not adapted for propulsion purposes in a light vehicle, it would seem clear that the first person who showed invention in reorganizing and adapting it would have been entitled to a patent for the improvement, and, with Otto's permission, could have used the improved engine in a vehicle. Similarly it would seem, that he might have obtained a patent for a combination embracing the improved Otto engine as an element. But those things could not have been done if infringement is shown in this case. Selden, although selecting the Brayton engine which was designed to avoid the explosive type, yet pre-empted the field and prevented all improvements for propulsion purposes in that type.

While the conclusion of noninfringement which we have reached leaves the patentee empty handed with respect to his patent for the short time it has to run, it cannot be regarded as depriving him through any technicality of the just reward for his labors. He undoubtedly appreciated the possibilities of the motor vehicle at a time when his ideas were regarded as chimerical. Had he been able to see far enough, he might have taken out a patent as far reaching as the

[9] Explosive action was the very thing which Brayton, who invented the engine which Selden modified desired to avoid. In his foundation patent of 1872, in speaking of the long slow-burning operation of the combustible, he says:

"While in the state of expansion consequent upon ignition it (the flame) exerts, not a spasmodic or explosive force upon the piston at the very commencement of its stroke when the expanding gas begins to act upon it, and the quantity of gaseous mixture during its period of admission is in proportion to the extent of the movement of the piston and is put into the state of expansion upon passing the interceptors."

The statement concerning Brayton in "Engineering" for February, 1877, seems well founded:

"He turned his attention to the design of an engine in which an explosive mixture could be gradually consumed without the ordinary explosive action."

Circuit Court held this one was. But, like many another inventor, while he had a conception of the object to be accomplished, he went in the wrong direction. The Brayton engine was the leading engine at the time, and his attention was naturally drawn to its supposed advantages. He chose that type. In the light of events we can see that had he appreciated the superiority of the Otto engine and adapted that type for his combination his patent would cover the modern automobile. He did not do so. He made the wrong choice, and we cannot, by placing any forced construction upon the patent or by straining the doctrine of equivalents, make another choice for him at the expense of these defendants who neither legally nor morally owe him anything.

The decrees of the Circuit Court are reversed, with costs, and the causes remanded, with instructions to dismiss the bills, with costs.

## On Taxation of Costs.

PER CURIAM. We think that the cost of the supersedeas bond was a necessary part of the expenses of appeal, caused by the erroneous decision of the court below. Although the bond was allowed as a favor and was not a matter of right, it was necessary to protect the appellant's interests pending the appeal. As it has not been customary to tax the premiums on supersedeas or appeal bonds in the Circuit Court of Appeals, the action of the clerk is affirmed, but the appellant should be allowed to tax these premiums in the Circuit Court.

The decision of the clerk on the other items is correct, and his taxation is affirmed.