SHAW ELECTRIC CRANE CO. v. HENRY R. WORTHINGTON et al.

(Circuit Court, D. New Jersey. January 22, 1897.)

1. PATENTS—INVENTION—ELECTRIC TRAVELING CRANES.
   In view of the previous employment of electric motors in propelling street cars and driving various kinds of machinery, there was no invention, in the year 1888, in merely applying electric motors to traveling cranes.
2. SAME.
   The employment of three independent electric motors controlled from a common point, for the purpose of moving the several parts of the old overhead traveling crane, does not involve invention.
3. SAME.
   The Shaw patent, No. 430,487, for improvements in electric cranes, *held* invalid as to claims 1, 2, and 10, for want of patentable invention.

This was a suit in equity by the Shaw Electric Crane Company against Henry R. Worthington, an incorporated company, and others, for alleged infringement of a patent relating to electric traveling cranes.

Francis Forbes and F. H. Betts, for complainant.
John R. Bennett, for defendants.

ACHESON, Circuit Judge. This suit is brought for the infringement of letters patent No. 430,487, dated June 17, 1890, for "improvements in electric cranes," granted to Alton J. Shaw, upon an application filed June 25, 1888. The defendants are charged with the infringement of the first, second, and tenth claims of the patent. These claims are as follows:

(1) In combination with a supporting track, a bridge mounted and movable thereon, a trolley or car mounted and movable upon the bridge, a hoisting drum or pulley carried by the trolley, and three independent electric motors, each in communication with a source of electricity, one of said motors being carried by, and serving to propel, the bridge, and the other two being carried by the trolley, and serving, respectively, to propel the trolley, and to actuate the drum or pulley.

(2) In combination with a supporting track, a bridge mounted and movable thereon, a trolley or car movable upon the bridge, a hoisting drum or pulley carried by the trolley, an electric motor carried by the bridge, and serving to impart motion thereto, a second electric motor carried by the trolley, and serving to propel the same, and a third electric motor, also carried by the trolley, and serving to actuate the hoisting drum or pulley; the several motors being wholly independent of one another, and all capable of reversal, whereby the attendant is enabled to cause a travel of the bridge in either direction, a movement of the car or trolley forward or backward, and a raising or lowering of the hoisting chain or cable simultaneously or at different times, and to perform each of said operations regardless of the others.

(10) In a traveling crane, the combination of a bridge, a trolley movable thereon, a hoisting drum or pulley carried by said car, three separate motors, one carried by and serving to propel the bridge, another carried by and serving to propel the trolley, and the third also carried by the trolley, and serving to actuate the drum or pulley, said motors being independently supplied with power from a source wholly outside the traveling crane.

The case, I think, turns upon the question whether these claims embrace anything that was patentable at the date of Shaw's alleged invention, in the year 1888. Now, the style of crane described and illustrated by this patent, and here involved, is none other than the ordinary overhead traveling crane (an old and well-known style of

crane), consisting of a bridge moving longitudinally to and fro upon supporting rails, a trolley or car moving transversely forward and backward upon the bridge, and a hoisting and lowering apparatus carried by the trolley. Prior to the year 1888, four different kinds of power-driven, overhead traveling cranes of the style above mentioned had been employed more or less extensively, namely, self-contained steam-power traveling cranes, hydraulic traveling cranes, square-shaft travelers, and rope-driven traveling cranes. The United States patent of 1875, to Force, and the English patent of 1878, to Newton, show each a self-contained steam-power overhead traveling crane, in which the three different movements of the parts —the longitudinal movement of the bridge, the transverse movement of the trolley, and the action of the hoist—are effected simultaneously or separately, as desired, by three independent engines, one for each separate part of the work, operated by the same attendant, standing in one position. As a consequence of this method of operating the several parts of the crane by three independent engines, shifting clutches, gripping devices, and reversing gear were largely dispensed with. Anterior to Shaw's alleged invention, the electric motor had come into successful practical use in every kind of service previously performed by steam engines and other motors. The peculiar advantages of the electric motor, such as the readiness with which it can be supplied with the electric current at whatsoever distance it may be located from the source of supply, its adaptability of direct application at the point where the power is needed, and its great working capacity as compared with its weight, were well understood. Moreover, the electric motor had already been applied to the practical working of cranes. Thus, we find in the Revue Générale des Chemins de Fer for October, 1884, a clear description of an electrically operated crane at the railway station in La Chappelle, France, consisting of a trolley traveling to and fro along a fixed overhead track and a hoisting mechanism, and provided with two independent electric motors, performing different operations of the crane, one of them being used for hoisting the load, and the other for propelling the trolley, and both controlled from a common point by the same operator.

The facts, then, being as above stated, what element of invention is to be found in the patent here in suit? In view of the previous employment of electric motors in propelling street cars, driving machinery in mills, working elevators, etc., the mere application of electric motors to traveling cranes certainly did not involve invention, even had Shaw been the first to operate cranes electrically. The inventive faculty was no more exercised here than in a multitude of other instances in every branch of industry where the electric motor has been substituted for the steam engine or other source of power. Was there anything patentably novel in the manner in which Shaw here applied the electric motors? I think not. Surely, after what had been done by Force and Newton, and after the publication with respect to the two-motor crane at La Chappelle, the employment of three independent electric motors, controllable from a common point, for the movement of the several parts of the old

overhead traveling crane, is not to be accounted as an act of invention. Nor did the location of the motors, two upon the trolley, and one upon the bridge, involve anything more than the exercise of good judgment and ordinary mechanical skill. It would have been singular had the additional electric motor been placed elsewhere than upon the bridge it was intended to move. Obviously, for the proper exercise of its function, the appropriate location of that motor was directly upon the bridge. The propelling electric motor bears the same relation to the bridge of a traveling crane as the electric motor of a street-railway car bears to the car. The differences between the cranes of Force and Newton and the crane of the patent in suit are simply such as would naturally be made in changing the motive power, and whatever of superiority over previously used traveling cranes is to be found in the crane of the patent is due altogether to the recognized advantages inherent in the electric motor. The defense of lack of invention is sustained. Let a decree be drawn dismissing the bill, with costs.