RADIO CORPORATION OF AMERICA v. DUBILIER CONDENSER CORPORA-TION et al.

No. 4279.

Circuit Court of Appeals, Third Circuit.

March 18, 1932.

Rehearing Denied July 6, 1932.

Charles Neave, of New York City (William G. Mahaffy, of Wilmington, Del., of counsel), for appellant.

Clifton V. Edwards, of New York City, for appellees.

Before WOOLLEY and DAVIS, Circuit Judges, and JOHNSON, District Judge.

WOOLLEY, Circuit Judge.

This appeal is from a decree of the District Court holding claim 9 of the Dunmore Patent No. 1,635,117 valid and infringed by the defendant's apparatus of the types known as Loud Speaker 104, Radiola 17 and Radiola 18, respectively. 34 F.(2d) 450. The case was consolidated for trial with two other suits between substantially the same parties, one of which concerned the Lowell and Dunmore Patent No. 1,455,141, previously disposed of by this court on appeal in an opinion reported at 59 F.(2d) 305. Although the ultimate issues as to validity in the two cases are quite distinct, reference is made to the opinion in the first case for a general statement of the art to which, in some of its phases, the invention of the patent in this suit relates.

The patent is for a "Signal Receiving System," "particularly adaptable for reception of signals in wire, wireless and radio telegraph systems." The main objects of the invention are "to provide a circuit arrangement for audio frequency signal receiving relays" and "to provide a relay which may be * * * operated from any alternating current source of power * * * such as the residence lighting circuit." The invention, as the plaintiffs state in a few words, consists of means for imparting positive potential to the plate and negative potential to the grid electrodes of a vacuum tube by low frequency alternating current. They say this was new and very useful and therefore amounted to invention, and that Dunmore was the first in the art to conceive and apply it.

The claim is for a combination. To determine precisely what is the invention we shall first look at the art and then, looking at the claim, separate old elements from the new and, placing them together, discover what new co-operative function they evolve. It is here that invention, if any, must be found. Grinnell Washing Machine Co. v. Johnson Co., 247 U. S. 426, 433, 38 S. Ct. 547, 62 L. Ed. 1196.

The art was that of February 27, 1922, when Dunmore filed his application for a patent and when broadcasting of entertainment programs had just begun and commercial receiving sets were first going on the market. The claim in suit, however, was not inserted in the pending application until three and one-half years later, and then only after the defendant had put out one of the devices here complained of as an infringement.

A signal receiving system and also a radio receiving set ordinarily contains several three-electrode vacuum tubes, including audio frequency amplifier tubes, which require electricity to operate them. For this purpose electricity is of two kinds, direct and alternating, and is derived from two sources, batteries and house current, respectively. The requirement of tubes in respect to grid bias is that the current shall be direct. The tubes do not care about the source of the current, but they demand one kind of current. In consequence, batteries (which always supply direct current) were in 1922 and are to some extent today used in receiving sets: One, known as the "A" battery, to heat the filament; another for furnishing current to the plate, known as "B" battery; and yet another ("C" battery) for giving a negative bias to the grid, which means maintaining the normal grid potential slightly more nega-

tive than that of the filament. It was true in the art then, as it is now, that if alternating current were applied to the grid connection the bias of the grid would be alternately positive and negative—positive at one instant and negative the next—and the tube would refuse to function as desired. Hence the use of a "C" battery by whose direct current a bias of either kind can be obtained according to which terminal is connected to the grid. When the negative terminal is connected, the bias is negative. But the things which were then and still are known and fixed in the art were that a normal grid potential more negative than that of the filament should be maintained, that it can be maintained by a steady, smooth, direct current, and that it cannot be maintained by current of any other kind.

This was the state of the art when Dunmore entered it with the patent in suit having for its main object provision for "a relay * * * operated from any alternating current source * * * such as a residence lighting circuit usually employing an alternating current of 60 cycles frequency at 110 volts. * * *" This, if it includes a receiving set, would dispense with the "C" battery.

The system of the patent as disclosed by claim 9 contains five elements in combination. Here, as in the Lowell and Dunmore patent, there would be invention and a very important one had the patentee invented all its elements, or had he brought old elements into new co-operative function. Of course the plaintiffs frankly admit that Dunmore did not invent all of them but insist that he adapted, or subjected, some of them to a new use, inventive in character. An analysis of the claim discloses in the beginning an old element that is common in receiving sets irrespective of the source from which current is obtained, namely: (a) An audio frequency amplifier tube of the three electrode type with its grid circuit and its plate circuit. Then follow (b) "a source of alternating current" (new); (c) "means for rectifying said current" (claimed to be new). At this point, the current, having started as alternating current, is rectified and becomes direct current; then

(d) "Means for supplying a negative potential to the grid electrode of said electron tube from said source of alternating current"—namely, supplying the potential from what is then direct current though derived from alternating current as its source;

(e) "Means for supplying a positive potential to the plate electrode from said source"—namely, supplying such potential from what is then direct current though derived from alternating current as its source.

Admittedly element "a"—electron tube—was prior art; certainly elements "d" and "e"—means employed for supplying potentials to the grid and plate—were old except as to the current source. Thus it appears that the essence of the claimed invention is the source of the current—(b) "a source of alternating current." Starting with alternating current at its source, Dunmore knew it could not be used to bias the grid until it had been converted or rectified into direct current. On that the art spoke to him loudly. He then set about to convert it into direct current (c) by means claimed to be new.

Electric current is the power used to energize vacuum tubes. It is, as all know, of the two kinds and is derived from at least the two sources we have mentioned. Each is electric power wholly without regard to its source. Dunmore's claim is somewhat elusive, but in essence it seems to be in substituting one power for the other. Yet it is hardly that, for substituted alternating current would not do the work of direct current in the tube. Rather he claims invention primarily in substituting the source of one power for that of the other, the idea of "source" being dominant throughout the claim. We cannot think this substitution, without more, constitutes invention. It is not even substitution of power of one kind for power of another kind. It is the substitution of power with certain characteristics for the same power with other characteristics. The mere substitution of power rarely, if ever, has an inventive quality. The substitution of a spring for a weight, of electricity for steam, would not, we surmise, be invention. The substitution of electric motors for steam motors, Shaw Electric Crane Co. v. Worthington (C. C.) 77 F. 992; Shaw Electric Co. v. Shriver (C. C. A.) 86 F. 466, and of a pneumatic regulator for an electric regulator have been held not to be invention, National Regulator Co. v. Powers Regulator Co. (C. C. A.) 160 F. 460.

But Dunmore says he did more than (b) substitute electric power of one kind for electric power of another kind, defined by their respective sources, in that he (c) rectified or converted the substituted ineffective alternating current into workable direct current. This certainly he did, and if he were the first to do it or if he did it in a new way it might be invention.

The apparatus, as disclosed by the specification and diagrams, is rather elaborate, yet for our purpose it is adequately described by the learned trial judge in his opinion. Speaking of the requirement that for a vacuum tube to function properly when used as an amplifier in a radio receiving set the normal potential of the grid must be negative with respect to the filament, he said:

"The means employed by Dunmore to obtain such grid potential, without interference from the source of alternating current, consist of a transformer connected through a primary winding with the current source, a secondary winding, a rectifier, a condenser to smooth out the rectified current, connected across the output terminals of the rectifier, and a resistance of desired value shunted across the output circuit of the rectifier tube. It is this resistance that causes the drop in potential and creates the desired negative potential on the grid."

We shall keep in view the plaintiffs' contention, with its limitation, that no one prior to Dunmore had converted alternating current into direct current and used it to energize the plates and negatively bias the grids of audio frequency amplifiers in a receiving system. It appears from the record, however, that Dunmore was not the first to convert alternating current into smooth direct current suitable for use in radio sets and not the first to use a transformer, rectifier, condenser or a resistance in such a system. A witness for the plaintiffs admitted "it was well-known in the art prior to 1922 how to rectify and filter alternating current." In this connection rectification means changing alternating current into direct current; filtration means smoothing out whatever fluctuations may then exist in the direct current so as to make it steady.

In 1919, Wilson by his patent No. 1,403,-932, Lowenstein in 1912 by his patent No. 1,231,764, Mathes in 1916 by his patent No. 1,426,754 and Scriven in 1918 by his patent No. 1,375,739 obtained negative grid bias with these common instrumentalities in different ways, one of which is the way the defendant claims it uses in certain parts of its Radiola 17 and its Loud Speaker 104.

But the plaintiffs, and the trial court on their persuasion, emphasize the Dunmore element of resistance, functioning like the resistance in the Langmuir patent No. 1,282,-439 as a leak, and point to this means, which causes the drop in potential and imparts the desired negative potential to the grid, as the capital element of the patented system, though it is not mentioned in the claim.

In 1917, by patent No. 1,445,278, Heising made use of resistance in a receiving set operated by direct current.

In 1916, Mathes in his patent No. 1,426,-754 and in 1918 Scriven in his patent No. 1,375,739 both employed resistance, and its drop, to obtain a negative grid potential in direct current operated sets.

Bront's Article shows the use of a rectifier and filter outfit with a voltage divider resistance across its output.

Wilson, by his patent No. 1,403,932, applied for in 1919, showed how to get negative grid bias by means of a resistance inserted in series in the plate circuit of battery operated tubes, the drop in potential across the resistance being supplied by the grid.

We think the plaintiffs' criticism of these references that, in effecting grid bias, they concern not an alternating current source but direct current from a direct current generator is beside the point for, after all, it is only direct current, however obtained, that produces negative bias in the grid. Once direct current has been obtained, its source is of no consequence, as thereafter it acts on and in the tubes precisely as does direct current from a storage battery.

Nor are we in this connection persuaded by the plaintiffs' insistence that the problems arising with respect to receiving sets operated from an alternating current source are radically different from the problems attending their operation by current obtained from a direct current generator. That, as broadly stated, may be true, but when looked into, the problems are not in the operation of the receiving set but in converting an impractical alternating current into an operative smooth direct current. Once this is done the receiving set will work.

We regard the Hull patent No. 1,251,377, issued in 1917, though alone not dispositive of the case, particularly informing to Dunmore. It is entitled "Method of and Means for Obtaining Constant Direct Current Potentials" and discloses an invention which "relates to a means for obtaining unidirectional currents or potentials of constant flow from variable sources, more particularly from a source of alternating current." The patent refers to various means previously employed for rectifying alternating current and inductances and condensers for reducing the variation in the current when rectified. It discloses without doubt an alternating current source, a

312

transformer with primary and secondary windings, a rectifier to convert alternating current into direct current and a condenser normally used on the direct current to filter or smooth out its fluctuations and thereby make it steady. It also employs a resistance. We do not find that the patent discloses use of the invention particularly in connection with the grid circuit. It contains however a statement that its system will produce a steady direct current from an alternating current source and may be used "in any organization in which the current may be utilized." Thus Hull's invention was a tool of the art. With this and other tools of the art in his hands, we cannot find that Dunmore made an invention when he applied them to an audio frequency amplifier tube effecting grid bias.

The decree below is reversed with direction that the bill be dismissed.