## LOWELL et al. v. TRIPLETT et al.
### No. 4261.

Circuit Court of Appeals, Fourth Circuit.
June 11, 1938.

Clifton V. Edwards, of New York City (Gaylord Lee Clark, of Baltimore, Md., John B. Brady, of Washington, D. C., and Reverdy Johnson, of New York City, on the brief), for appellants and cross-appellees.

Stephen H. Philbin, of New York City (Charles Markell, of Baltimore, Md., and Fish, Richardson & Neave, of New York City, on the brief), for appellees and cross-appellants.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

SOPER, Circuit Judge.

This case involves cross appeals from a decree of the District Court in a suit for infringement of three patents relating to radio receivers operated by alternating electric current, to wit: Lowell and Dunmore patent No. 1,455,141 issued May 15, 1923 upon an application filed March 27, 1922, which for convenience is sometimes called the receiver patent; Dunmore patent No. 1,635,117 issued July 5, 1927 upon an application filed February 27, 1922, referred to as the grid patent; and Dunmore and Lowell patent No. 1,606,212 issued November 9, 1926 upon an application filed March 21, 1922, referred to as the speaker patent. All of the claims of the receiver patent and of the grid patent in suit were held invalid for lack of patentable invention, and some of them because of improper disclaimers. It was also held that none of the claims of these two patents was infringed. The claims in suit in the speaker patent were all held to be valid and infringed. Cross appeals followed.

These patents were litigated in Dubilier Condenser Corporation v. Radio Corp. of America in the District Court of Delaware, wherein the receiver patent and the grid patent were held valid and infringed and the speaker patent not infringed, 34 F.2d 450; but on appeal the claims in suit of the receiver and grid patents were held invalid for want of invention, 3 Cir., 59 F.2d 305; 59 F.2d 309. No appeal was taken by the plaintiff from so much of the decree as related to the speaker patent. Certiorari was denied, 287 U.S. 648, 53 S.Ct. 96, 77 L. Ed. 560; 287 U.S. 650, 53 S.Ct. 96, 77 L.Ed. 562.

Subsequently, the patentees filed in the Patent Office disclaimers as to each of the claims held invalid in the litigation in the Third Circuit, and then brought the present suit on these claims as modified and on other claims. The District Court dismissed the suit as to the receiver and grid patents on the ground that the disclaimers were improper; but found the speaker patent valid and infringed. This court reversed as to the receiver and grid patents but did not decide the appeal as to the speaker patent, and sent the case back to the District Court with leave to the parties to introduce additional evidence, 4 Cir., 77 F.2d 556; and this decision was affirmed by the Supreme

Court, 297 U.S. 638, 56 S.Ct. 645, 80 L.Ed. 949. The appellate courts, however, did not consider the merits of the patents. The conclusions of the District Court upon the merits at the new trial are stated above.

The theory of the radio art is stated with admirable clarity in the opinions of the trial courts, which have considered these patents, and need not.be repeated here in detail. The aerial or antenna of the broadcasting station is caused to vibrate by an alternating electric current of a high frequency assigned by the Federal Communications Commission, within a range from 550,000 cycles per second to 1,500,000 cycles per second, and thereby ether waves of like frequency are sent out in all directions. Such frequencies, termed radio frequencies, are of themselves inaudible, but they have a great range and the velocity of light, and their chief function is to act as carriers for the sound waves. These have much lower frequencies, termed audio frequencies, between 12 cycles per second to 16,000 cycles per second, and they are impressed upon the carrier waves at the transmitting station so that the latter are changed from a series of waves of uniform amplitude to waves of varying amplitude as modulated by the sound.

The receiving antenna intercepts the modulated ether waves and thereby electrical currents of identical frequency with the carrier waves are set up; and it then becomes the function of the radio receiving set to take therefrom the audio frequency currents and apply them to the diaphragm of the loud speaker so that it will vibrate in accordance with ·the audio frequency currents, send out air waves, and thus reproduce the sound. That part of a receiving set which selects from the modulated carrier waves their audio frequency components is spoken of as a detector or rectifier.

The receiving set must perform another service before the voice can be heard. The modulated ether waves journey great distances through space and are very small when picked up by the receiving aerial; and so the currents which they induce must be greatly strengthened or amplified to be effective. Both functions, amplification and detection, are performed in modern radio art by the radio vacuum tube. The receiver patent in suit avails itself of this agency and discloses a set composed of three parts, a radio frequency section, in which the signal is received and amplified, a detector section, in which the audio frequencies are detected, and an audio frequency section, in which these audio frequencies are amplified and reproduced in the loud speaker. In each of the sections of the set a vacuum tube is employed although the patent indicates the use bf a crystal, such as carborundum, rather than a tube as a detector, a preference which the subsequent experience of the art has shown to be mistaken.

The tube consists of an evacuated envelope of glass or metal, enclosing at least two electrodes, the cathode or filament, and the anode or plate, the former being the negative and the latter the positive terminal of an electrical source, as the names imply. When the cathode is heated by an electric current, it gives out infinitely small carriers of charges of negative · electricity called electrons which stream across the tube to the plate because they are attracted by the positive charge upon it. In earlier days the filament and the plate were energized by batteries, called A and B batteries respectively. Later the three electrode tube was invented which contains a third electrode, called from its appearance the grid, and usually placed between the filament and the plate. The function of the grid is to control the flow of electrons from the filament to the plate. In a modern receiving set, the radio frequency currents picked up by the aerial are conducted by wire to the grid of the first radio frequency amplifying tube. These signal currents are alternating and hence the grid is electrically charged positively and negatively many thousand times a second. It is customary also to give the grid a permanent electrical charge, most frequently a negative bias, supplied in the earlier sets by what was called the C battery. The charges upon the grid cause the field around it to vary accordingly and to affect the passage of the electrons flowing through this field from the cathode to the plate. It has been found that a change in grid voltage has much more effect upon this flow than a change in plate voltage. In addition, as the field of the grid becomes positive, more electrons will pass, and as it becomes more negative, less electrons will pass. In this way a heavy plate current can be pulsated by a small signal current on the grid. It thus becomes possible through the agency of the tube to add to the signal currents electric energy from a battery, or from an alternating house current, and thereby to amplify the signal currents and make them available.

The tube can also be used to rectify or change the alternating current into direct

current with pulsations. The current in the tube circuit can only flow in one direction from the cathode to the anode; and the electrons will flow from the filament only when it is negative so that when in each alternation of the current the cathode becomes positive, no electrons flow to the positively charged plate. The result is that a direct or unidirectional current flows to the plate. It is not, however, a smooth current, such as is furnished by a battery, but is a pulsating current, and it is and has been common practice to reduce these pulsations to a minimum and approximate the smoothly flowing current of a battery by filtering the pulsations through certain electrical appliances, known as condensers and resistances. Such a method is indicated in the receiver patent as the means of obtaining a source of energy from the plate circuits of the tubes.

It has already been pointed out that the tube may be used as a detector whereby the radio frequency signals are converted so that the diaphragm of the loud speaker will be actuated only by the variations in amplitude of the incoming waves. This operation may be performed by a two element vacuum tube which depends upon the property of permitting the passage of current in one direction only. The individual cycles of current in one direction are cut off in passing through the detector, leaving at the output a series of unidirectional impulses varying in amplitude according to the modulation; and these impulses, passing through the loud speaker, cause the diaphragm to vibrate in accordance with the modulations which, being of low frequency, can be heard. The same function may be performed by the three element vacuum tube.

It will have been noted that the tube requires a supply of electrical energy for each of the electrodes, and that the source formerly used comprised the A, B and C batteries for the cathode, anode and grid respectively. The trouble and expense of such batteries has been eliminated in modern receiving instruments, and the needed energy is now secured by ordinary alternating house current. The patents in suit are concerned with the solution of certain problems which arise in connection with the use of house current in a receiving set. It is not contended that the patentees were the first to make use of alternating current in the operation of a radio receiver, although it is claimed that they were the first to advocate the use of alternating current to energize the grid of the vacuum tube. Methods for energizing the cathode and the anode by house current had already been shown in prior patents and publications, but had not come into general commercial use. Nor did the disclosures of the patentees result in general acceptation. The defense asserts that receiving sets operated by alternating current did not become commercially practical until the so called A-C tube, hereinafter referred to, had been invented and perfected; and more specifically the defendants claim that it did not require inventive skill to apply to the grid old methods of supplying electrical energy to the cathode and the anode; or to obviate the difficulties arising in various parts of the set from the use of alternating current, by using devices well known to persons skilled in the electrical and radio art.

Certain disturbing effects accompany the introduction of alternating current into the tube circuits; and it is these effects which it is the purpose of the patents to overcome. Such a current flows in a circuit first in one direction and then in the opposite direction. Starting at zero it builds up to a maximum positive strength and returns to zero, completing a one-half cycle, and then builds up to a maximum negative strength and returns to zero, completing the corresponding one-half cycle. The usual 110 volt house current has 60 cycles per second. As we have seen, the modulated signal from the aerial is introduced into the grid of the tube and thereby its characteristics are impressed upon the flow of electrons into the tube and upon the plate current into which they enter. Obviously, anything which affects the current that energizes the grid and the plate will affect the signal. Furthermore, the grid circuit and the plate circuit must each be connected to the filament circuit to enable the tube to operate. When alternating current is used to heat the filament, with its constantly recurring reversals of direction and changing polarity in the legs of the filament, variations of the normal potential of the grid and of the plate occur with respect to that of the filament as a whole, if the plate circuit and the grid circuit are connected to one leg of the filament. In addition, the alternations of the current produce fluctuations in the temperature of the filament and in its magnetic field and electrostatic field, which affect the flow of the electrons. The consequence of these disturbing effects from the use of alternating current is manifest in the output of

the loud speaker. The 60 cycle house current is itself within the band of audio frequencies and these vibrations tend to distort the modulations of the weak incoming carrier wave and to produce a gurgling or gargling sound in the loud speaker which is the more objectionable because it has been amplified. Even if the message is not distorted, it will be accompanied by a strong hum produced by the 60 cycle pulsations that may be strong enough to drown out the transmitted sounds.

The receiver patent 1,455,141 of Lowell and Dunmore deals with the problem of energizing the circuits of the tube of a radio receiving set with standard alternating house current without interference in the loud speaker from the hum of the power supply. The filament in each tube is supplied with raw alternating current; the plate with alternating current, that has been rectified and filtered; the signal current is conducted to the grid; and the plate and grid circuits are connected with the filament circuit. The first or radio frequency amplification part and the third or audio frequency amplification part of the set are equipped with tubes. The detector section is supplied with a crystal detector, and one would suppose from reading the patent that for the elimination of hum, the use of a crystal detector is well nigh essential. The patent, however, suggests that other forms of detectors may be used, and it is only in this aspect that the patent assumes practical importance because the use of the crystal as a detector has been abandoned in modern sets for the much more effective tube. The gist of the patent we are told lies in the hum eliminating means other than the crystal which it describes. These were not listed in the original claims but are set out in the specification of the patent and in the claims as modified by the disclaimers. Therein three hum eliminating means are specified and are now relied upon to show that the patent was based upon invention.

Claims 1 to 4 and claims 7, 13, 14 and 18 are in suit. Of these claims, 1, 2 and 18 are directed to the radio amplifier and detector portions of the set and claims 3, 4, 7, 13 and 14 to the combination of all three sections of the set. Claims 1 and 3, which may be taken as typical, are as follows:

"1. In an apparatus for receiving radio signals the combination of a source of signal energy, means for amplifying said energy, means for rectifying said energy, and a source of alternating current for supplying power to said amplifying means and a plurality of means in circuit with said amplifying means for eliminating the hum of said alternating current in said apparatus."

DISCLAIMER: (1) To any "source of alternating current for supplying power to said amplifying means" as set forth in claim 1 except such as supplies raw alternating current to the cathode heating circuit or circuits of such amplifying means and rectified current to the plate circuit or circuits of such amplifying means; to any plurality of means in circuit with said amplifying means for eliminating the hum of said alternating current in said apparatus "except such means as comprises: (a) a connection from the grid of the amplifying means to the cathode thereof at a point not subjected to the influence of variations of the cathode heating current; (b) elements connected between the stages of said amplifying means which prevent the passage of power supply frequencies; and (c) a resistor shunted by a condenser interposed in the circuit between the grid and cathode of the amplifying means where said condenser forms a low impedance path for both signal and power supply frequencies and wherein the voltage drop across said resistor provides a negative bias for the grid of the amplifying means".

"3. In an apparatus for the reception of radio signals the combination of a source of signal energy, means for amplifying said signal energy at radio frequencies, means for rectifying said energy, means for amplifying said energy at audio frequencies, a source of alternating current for supplying power to said amplifying means and separate means connected to each of said amplifying and rectifying means for eliminating the hum of said alternating current in said apparatus."

DISCLAIMER: "(3) To any 'source of alternating current for supplying power to said amplifying means' as set forth in claim 3 except such as supplies raw alternating current to the cathode heating circuit or circuits and rectified current to the plate circuit or circuits of such amplifying means; to any 'separate means connected to each of said amplifying and rectifying means for eliminating the hum of said alternating current' except as comprises: (a) connecting the grid of the amplifying means to the cathode thereof at a point not subject to the influence of variations of the cathode heating current; and (b) elements connected between the 'means for amplifying

said signal energy at radio frequencies' and the 'means for rectifying said energy' which prevent the passage of power supply frequencies."

The instrumentalities by which the hum is eliminated and the modulated carrier wave is delivered undisturbed from the radio frequency to the detector section are three in number, and may be listed as follows: (1) A midpoint connection of the grid to the cathode; (2) a resistor condenser combination in the circuit between the grid and the cathode; and (3) transformers between the amplifying tubes and between the radio frequency and the detector sections.

The midpoint connection is designed to cut down or minimize the variations in potential caused by the use of alternating current between the plate and the cathode and between the grid and the cathode respectively. It is used in the patent in suit only in the circuit between the grid and the cathode. When the alternating current is applied to the cathode, first one end or leg thereof will have a maximum positive voltage while the other has a maximum negative voltage, and then this condition will be reversed with the next alternation of the current and so on indefinitely. If the plate or the grid is connected to one end of the cathode, as is usually done in the battery operated sets, the potential of the plate or the grid will vary with the maximum changes of the potential of the cathode. The result is an undesirable hum in the receiving set. But if the plate and the grid are connected to the electrical midpoint of the cathode, the maximum difference in potential between each of them and the cathode will be much reduced. This arrangement is made in the patent by connecting the grid to the midpoint of a coil or resistor interposed across the legs of the filament. It is used with the amplifying tubes both in the radio frequency and audio frequency parts of the set. The plate, however, is not connected to the midpoint but to the cathode at one end.

The efficacy of this device as a hum eliminator is not disputed, but it was well known to the art and had been disclosed in previous patents. Thus in the patent to White 1,195,632 of August 22, 1916 and the patent to Heising 1,432,022 of October 17, 1922, the substitution of raw alternating current in place of an A battery to heat the filament of a tube was shown and the disturbing effect of such a current was overcome by a midpoint connection. The patent to Colpitts and Arnold 1,388,450 of August 23, 1921 is also relevant. White showed the use of the device in a transmitter where the hum problem is not so great as in a receiver because the ratio of the hum to the great strength of the broadcasting signal in the transmitting station is small; but nevertheless it is the same sort of problem, and Heising suggested the use of the device generally in connection with vacuum tubes for amplifying variable currents, detecting wireless signals and other purposes. Lowell and Dunmore in this respect merely made use of an instrumentality well known in the art.

The second instrumentality listed in the patent for the elimination of hum is the resistor condenser combination in the grid circuit. It is used in both the radio and audio sections of the set in the grid circuit of the amplifying tubes. It is placed adjacent to the resistance across the legs of the filament and is connected to the midpoint thereof. It consists, as its name implies, of a resistance shunted by a condenser. Its function is to keep the grid at a proper negative voltage for purposes of amplification. It is noteworthy that the resistor condenser device is not mentioned in the patent as a separate hum eliminating means but only in combination with the midpoint connection. To the latter is ascribed the function of stabilizing the grid voltage with respect to the filament and neutralizing the effect of the alternating current on the filament. The plaintiffs' expert in the Third Circuit did not mention the device as a hum eliminating means. Moreover, the tests made in the District Court in the pending case indicated that the device performs a minor part as an eliminator.

The combination of a resistance and condenser for the purpose of obtaining grid bias for a detector tube is shown in the Langmuir patent 1,282,439 of October 29, 1913, but the device functioned to give a grid bias which varied in accordance with the signal. Lowell and Dunmore were the first, it appears, to use the device to give a constant negative bias to the grid for purposes of amplification, and set out the actual value of the condenser and resistance to be used for this purpose. It is not necessary at this point to decide whether or not in view of the disclosures of the Langmuir patent (which used direct current) and in view of the other patents hereinafter mentioned in the consideration of the grid patent (Dunmore, 1,635,117) it required in-

ventive skill to arrange the resistor condenser combination so as to obtain grid bias, for we are now considering the device only as a means for the elimination of hum. These patents, however, do show that the art was well aware that the capacity of the condenser to act as a reservoir of current and of the resistance to cause a drop in potential are properties that make the device a useful adjunct when a steady flow of current from an alternating source is desired. For such a purpose the resistor condenser combination was not new.

The third instrumentality for the elimination of hum, upon which the patentees rely, consists of the radio frequency transformers which couple the radio frequency amplifiers to one another, and also couple the last frequency radio amplifier to the detector section. These amplifiers are designed to pass the high radio frequencies through the set, and to deter the passage of low hum frequencies that are présent in the plate circuit. A transformer, consisting of two coils of wire adjacent to one another—a primary and a secondary coil— whose windings are so arranged as to pass or transfer most effectively currents of some predetermined frequency, was well known to the electrical art. As used in the radio frequency section of the set of the patent, transformers are useful in reducing the hum although they do not eliminate it altogether, especially if the signal wave has become distorted by the 60 cycle alternating current. The use of such a transformer in a radio set for the indicated purpose, however, was not new with Lowell and Dunmore. It was employed to transfer radio frequency currents from one circuit to another, in which alternating current was used, in the White, Heising and Colpitt and Arnold patents; and the useful purpose in minimizing hum currents which the device serves was pointed out in the articles of Moye and Dr. P. C. In short, the patentees availed themselves in this respect of a useful agency with which the art was familiar.

The crucial question is whether the association of the three hum eliminators in the radio receiving set disclosed in the Lowell & Dunmore patent 1,455,141 amounts to patentable invention. We take the view that it does not. The three part receiver with radio frequency, detector and audio frequency sections, and its operation by direct current, was old. The use of alternating current in connection with the cathode and the plate of the tube was also old, and it was well within the expected skill of the calling to use the same kind of power supply in connection with the grid. The hum eliminators, upon which the effective operation of the set depends, had been used by predecessors in the field, as we have shown, and it was the performance of the skilled worker rather than of the inventor to assemble them in the manner shown in the patent.

It is noteworthy that although the Lowell and Dunmore disclosure was widely publicized, it met with only meager commercial recognition—far less than one would expect if in fact it afforded a practicable means of eliminating the troublesome batteries in the operation of the receiving set. It was not until 1927 that sets operated by alternating currents were widely and successfully marketed. It was in that year that the unipotential tube (AC tube) was perfected and became commercially practical. In this tube the cathode is divided into two parts, one part being the filament heated by raw alternating current and the other part an envelope disconnected from the filament but near enough to be heated by radiation. The latter part emits the electrons, and since it is not subject to the fluctuations of the alternating current, it is not necessary to use the midpoint connection prescribed by the patent. The AC tube was found to be particularly effective when operated as a detector by alternating current so that the crystal which Lowell and Dunmore employed is no longer used in commercial sets. With the perfection of this device, the use of alternating current in receiving sets became universal, and it is a reasonable conclusion that the result was due to the new tube rather than to the Lowell and Dunmore invention.

### Dunmore Patent 1,635,117.

This patent involves means for supplying a negative potential to the grid of a radio vacuum tube used as an amplifier from a source of alternating current and has been called in this litigation the grid patent. Claims 9, 11 and 12 are in suit of which it will be sufficient to set out Claim 9 as modified by a disclaimer.

"9. A signal receiving system comprising in combination an audio frequency amplifier including an electron tube having grid, filament and plate electrodes, an input circuit interlinking said grid and filament electrodes, an output circuit interlinking said plate and filament electrodes, a source of alternating current, means for rectifying

said current, means for supplying a negative potential to the grid electrode of said electron tube from said source of alternating current, and means for supplying a positive potential to said plate electrode from said source of alternating current, whereby said audio frequency amplifier operates to amplify signaling energy without interference from said source of alternating current."

DISCLAIMER: "(2) Any 'filament electrodes' specified in claim 9 except such as are energized by raw alternating current; and any 'means for supplying a negative potential to the grid electrode of said electron tube from said source of alternating current' as specified in claim 9 except such means as comprise a bias determining resistance connected in a series path between the grid and filament electrodes and shunted by a condenser of low impedance to power supply frequencies."

It will be observed that the claim calls for an audio frequency amplifier consisting of a tube containing grid, filament and plate electrodes supplied with alternating current. The grid and filament are connected in the input circuit and the plate and filament in the outgo circuit. The current is rectified and used to supply a negative potential to the grid and a positive potential to the plate in such a fashion that the signal is amplified without interference from the alternating current. The disclaimer limits the means for supplying the negative potential to the grid to a bias determining resistance between the grid and the filament shunted by a condenser of low impedance to power supply frequencies. This is the pith of the claim.

In order for the tube to operate as an amplifier, it is important that the grid should be slightly more negative in potential than the filament, and also that the negative bias should be constant. In order to accomplish these results, the patent provides that the alternating current be first passed through transformers and then through a rectifying tube whereby it is changed into a pulsating direct current; thence it is passed through a resistor condenser unit. The resistance causes a drop in potential and creates a negative bias on the grid and as it is in shunt with the condenser, the voltage across the resistor is kept substantially steady. The condenser offers more impedance to low frequencies than to high frequency currents, so that the signal current passes through readily while the power current periodically charges the

condenser and is discharged across the resistance so that the voltage tends to remain at a steady value.

■ The plaintiffs emphasize that Dunmore was the first to use rectified alternating current to negatively bias the grid of an audio frequency amplifier in a radio receiver; and the question arises whether this step was a sufficient advance over the teachings of the art to justify the grant of the patent. It may be safely said that the art well knew how to rectify alternating current so as to produce pulsating unidirectional current and how to filter it so as to smooth out the fluctuations which remained. The Hull patent 1,251,377 of December 26, 1916 discloses means for obtaining unidirectional currents or constant flow from a source of alternating current; and the means include a transformer, a rectifier, a condenser and a resistance. Although this patent does not suggest the use of the invention in connection with the grid circuit, it was regarded by the Circuit Court of Appeals for the Third Circuit in considering the patent in suit, (Radio Corp. v. Dubilier Condenser Corp., 59 F. 2d 309, 311), and by the District Court in the pending case as so informing to the patentee as to negative invention in the patent under consideration. In addition, the Robinson patent 1,587,084 of June 1, 1926 showed an arrangement of the circuits of three electrode tubes in which the plate circuits are energized by alternating current and the grid potential is regulated so as to minimize the low frequency variations in the plate current. The figures of the patent show that the grid was biased from the plate current by the use of a condenser resistance unit. The patents to White and Heising also furnished relevant information. In view of these disclosures of the art, it does not appear that the disclosures of the patent rose to the dignity of invention.

Dunmore and Lowell Patent 1,606,212.

This patent, called herein the speaker patent, provides an arrangement which is designed to eliminate substantially the disturbing effects of the operation of the loud speaker by alternating current. After the signal passes through the detector section of the set, it is amplified in one or more audio frequency amplifier tubes, so as to obtain in the plate circuit of the last tube a current of sufficient volume to actuate the diaphragm of the loud speaker. The typical speaker of the prior art employed a large

magnet, either a permanent magnet or electromagnet, whose field coil was energized by direct current. An armature winding, sometimes designated as the voice coil for the reception of the signal from the last amplifier, was located in the field of the magnet and attached to the diaphragm of the speaker. The result was that when the current in the voice coil varied with the modulation of the signal, the magnetic attraction between the two coils was increased and decreased, the voice coil and the attached diaphragm were vibrated and the sound was reproduced.

The apparatus of the patent includes two audio frequency amplifiers and a loud speaker, all operated by house current. This current energizes the primary coil of a transformer to which are attached secondary coils, one heating the cathode of a rectifier and the other furnishing the current to be rectified and supplied to the field coil of the magnet. This rectified current is a pulsating current, and unless precautions are taken, will produce variations in the magnetic field and will react against the current in the voice coil and cause a movement of the diaphragm and a distortion of the modulation. The output of the amplifiers is conducted to the voice coil of the loud speaker and in this also some residual power current frequencies are also found notwithstanding the use of the corrective devices prescribed in the receiver patent.

The patentees propose to set off one of these disturbing effects against the other so that the pulsations in the voice coil from the output of the amplifiers will neutralize the pulsations set up in the field coil by the rectified current derived from the house supply. They accomplish this result by winding the two coils in opposite directions so as to bring the pulsations into phase opposition.

Claim 2 of the patent is as follows: "2. In an apparatus for the reproduction of sound, a thermionic vacuum tube amplifier, an input circuit, an output circuit, a power source of alternating current, means for rectifying said current, a loud speaker reproducer connected in said output circuit and comprising an armature winding and a field winding and circuits for supplying said rectified current to said output circuit and to said field winding; said windings being connected in such relation that disturbing current effects in said loud speaker reproducer are substantially eliminated."

There seems to be no question that Dunmore and Lowell were the first to operate a loud speaker with alternating current, but it is suggested that the Pridham and Jensen patent 1,105,924 of August 4, 1914 contains information so relevant to the structure disclosed by Dunmore and Lowell that it was not patentable. Pridham and Jensen designed an arrangement to be used in connection with a telephone receiver to prevent the fluctuations of current in the field coil from affecting the diaphragm of the receiver. They obtained this result by dividing the voice coil into two sections, each subject to the influence of the field coil; and they connected these sections so that the induced currents therein would be in phase opposition to one another and would neutralize one another. The difference from the structure under consideration is that in Pridham and Jensen two parts of the voice coil were placed in phase opposition whereas in Dunmore and Lowell, the field and voice coil were so disposed, the purpose being the same in each instance.

We think that these structures are very close in purpose and in operation, and that if the Pridham and Jensen patent had not expired, a strong case of infringement thereof by the Dunmore and Lowell structure could be made out. It is true that Pridham and Jensen speak of the use of direct current, but they point out that their apparatus could be used with a high degree of success with direct current, affected by strong fluctuations such as those produced by a dynamo. Such a current resembles quite closely the rectified and filtered current applied to the field coil by Dunmore and Lowell. In our opinion, the changes from Pridham and Jensen which they introduced are not indicative of inventive skill.

The decree of the District Court insofar as it dismissed the bill of complaint with respect to the receiver patent and the grid patent is sustained; and the decree insofar as it sustained the validity of the speaker patent is reversed and the case is remanded to the District Court with directions to dismiss the bill of complaint.

Affirmed in Part.

Reversed in Part.