ELECTRO-DYNAMIC CO. v. UNITED STATES LIGHT & HEAT CORPORATION.

(Circuit Court of Appeals, Second Circuit. December 14, 1921.)

No. 49.

1. Patents ☞328—1,019,482, claims 1-4, 7, and 8, for method and means of charging storage batteries, not infringed.

Claims 1-4, 7, and 8 of the Kennedy patent, No. 1,019,482, for a method and means of charging storage batteries in connection with train-lighting systems, when construed consistently with the patentee's actual achieve-

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ment, consisting of a device for determining the amount of current in the batteries and for cutting down the charging current, when the battery is sufficiently charged, but which shows only the amount of current that ought to be in the batteries, if the precalculated assumptions regarding input and outgo are correct, *held* not infringed by a system embracing a meter responsive to the battery current and indicating at all times the actual or exact charge in the battery.

**2. Patents ⟨⌖⟩101—Claim must be fortified by disclosure.**

Even the broadest or most loosely drawn method or combination claim must be fortified by a disclosure of how the method is to be practiced, or of the kind and nature of the elements combined.

**3. Patents ⟨⌖⟩243—Combination claim not infringed, except by substantially the same elements functioning co-ordinately in the same way.**

A patented combination, if good for what its elements will really co-ordinately accomplish, is not infringed, unless the infringing ,combination is of substantially the same elements, functioning co-ordinately in the same way.

**4. Patents ⟨⌖⟩46—Not inoperative, though possessing no practical utility.**

A patent cannot be struck down as inoperative, in the sense of the patent law, where the device will operate, at least in a laboratory, though it possesses no practical utility.

Appeal from the District Court of the United States for the Western District of New York.

Suit by the Electro-Dynamic Company against the United States Light & Heat Corporation. From a decree for defendant (Consolidated Ry. Electric Lighting & Equipment Co. v. United States Light & Heat Corporation, 246 Fed. 127), plaintiff appeals. Affirmed.

Suit is on claims 1, 2, 3, 4, 7, and 8 of patent to Kennedy (owned by plaintiff), No. 1,019,482, issued March 5, 1912, upon an application filed March 17, 1908. The patent is for "charging storage batteries." It "relates primarily to an improved method [whereby] * * * the battery shall be automatically recharged to its full capacity, or preferably slightly overcharged, and yet [will not receive] an excessive overcharge."

The specification asserts that "the invention is of peculiar value in connection with train-lighting systems," wherein the generator is driven from the car axle. In point of fact, the invention has no indicated utility, other than in "connection with" car-lighting systems generally known and practiced in and before 1908. For that reason, doubtless the patentee states the systems "which have been most widely used in practice." They were (and are) those based upon (1) the attempted maintenance of a constant current from the generator; and (2) the attempted securing of a constant potential on the main circuit, regardless of the quantity of current flowing therein.

By reference to cases adjudicated and reported in this circuit, it appears that patent to Creveling, 747,686, broadly covers a system of the first class, wherein, when by the constant current the batteries have been charged, so as to develop a predetermined back voltage, a "stop-charge relay" is actuated by said back voltage, and further charging thereby prevented until such time as the back voltage again sinks below the predetermined limit. Safety, etc., Co. v. United States, etc., Co. (D. C.) 222 Fed. 310; affirmed 223 Fed. 1023, 138 C. C. A. 651. Of the second class, patent to McElroy, 893,533, furnishes an example. In this system the current need not be constant. The attempt is to maintain constant voltage or potential, which, however, by the use of regulating coils, whereof one acts directly on a rheostat, gradually decreases as the battery charging continues; and this is a system wholly different from the constant current device of Creveling. It illustrates a different plan of operation. Safety, etc., Co. v. United States, etc., Co. (D. C.) 233 Fed. 1007, and 237 Fed. 646.

The object of Kennedy was to improve either of these systems in respect

of battery charging or overcharging; he was not concerned with control or regulation of the generator; he asserts in substance that his improvement will benefit either of the above indicated systems. The essence of that improvement is to interpose between generator and battery what has been called at bar an "ampere hour meter," a device calculated to permit the generator to continue charging, regardless of varying conditions of speed or quiet, of lamps lit or darkened, for a predetermined number of ampere hours. The specification shows, by way of illustrating or teaching patentee's discovery, the insertion of this device into a typical constant current system, substantially that of Creveling. For the purposes of this case it is assumed that it functions equally well in a constant potential system; but no such finding is made.

The patentee recognized that in any system of axle-driven generation of current for car lighting, absolute accuracy in rate of delivery was not always attainable; he knew that there never comes out of a storage battery as much as goes in, and that leakage is continuous; and he believed that a slight overcharge with the batteries in that state "floating on the system" was a desideratum. He therefore so constructed his "ampere hour meter" that it only began to register (assuming batteries empty) after current had flowed into batteries for a predetermined time. Thus (as the specification states) the device indicates "less than the actual ampere hours of charge [so as to] make up for this loss." This is called at bar the "corrective factor."

The mechanical detail of Kennedy's meter is unimportant; it is enough to note that current flowing into or out of the storage batteries actuates magnets which draw into operative relation the parts of a registering device, to the end that, assuming a normal or constant generator current of (say) 30 amperes, there will be shown the net number of ampere hours for which the batteries should be charged. If lamps are lit, and by precalculation are consuming 30 amperes, the battery charge shows no change; if more is consumed, then the charge is shown as diminishing; if less than (say) 30 amperes, or if there is no load at all, the charge is indicated as increasing.

But when (say) 30 ampere hours are shown, then mechanically, by the action of a lug or extension of the indicator finger, a switch is closed and a circuit established, in which is a magnet "designed to operate when the voltage has reached a point which indicates full charge." If in point of fact the designer's precalculations are wrong, through (probably) the accidents of rough tracks, change of temperature, or the like, and the back voltage is not as great as expected, charging will continue, but the patentee's register will (if no lamps are lit) stay at its erroneous 30 ampere hours. When, however, the back voltage is strong enough, the "magnet" will "operate," and the battery charging current be cut down to a "maintaining current," calculated to be enough to make up for leakage.

On this disclosure are founded the claims in suit, of which 1 and 2 are for a method, and 3, 4, 7, and 8 for a means (if not the means) of applying that method. The most general method claim is as follows:

"1. The method of charging storage batteries which consists in supplying a charging current to the storage battery for a predetermined number of ampere hours, regardless of the electromotive force of the battery, and thereafter causing a predetermined maximum potential difference across the battery terminals to discontinue the charging current, substantially as described."

Of the claims for means, the third substantially defines the device of the disclosure thus:

"In a train-lighting system, a generator driven from the car axle, a storage battery connected to said generator to be charged thereby, and mechanism for regulating the generator to a constant current output, in combination with a controlling device in said circuit which discontinues the charging current when the potential thereof reaches a predetermined limit, and mechanism for rendering the controlling device inoperative until the battery has been charged to a predetermined number of ampere hours, substantially as described."

The seventh avoids reference to the constant current system of the specification and drawings, as follows:

"In a train-lighting system, a generator driven from the car axle, a storage battery connected to said generator to be charged thereby, a traveler mecha-

nism responsive to the current flowing in the battery circuit to move the traveler a distance proportional to the charge in the battery, a circuit-controlling device actuated by said traveler when it reaches a predetermined position, a second circuit-controlling device responsive to the difference of potential across the battery terminals, and mechanism for discontinuing the flow of charging current to the battery when said circuit-controlling devices are both closed, substantially as described."

Defendant makes and sells two constant potential systems, following in substance the teachings of McElroy, but interposes between generator and batteries an ampere hour meter, responsive to the battery current, and indicating (or capable of indicating) at all times the actual or exact charge in the battery in ampere hours. In defendant's so-called "standard system" the meter indicator, on arriving at battery full position, short circuits a resistance normally in circuit with the voltage coil of the system (the coil *13* of 237 Fed. 650), and thus reduces the generator's voltage to a point that permits the batteries to "float," but leaves the generator to continue supplying lamps. Defendant's "double-relay" system it does not seem necessary to describe, in the view taken of this litigation. There are no vital differences between the two; both are alleged to infringe.

Hazel, District Judge, in the District Court, summarized the defenses as "limitation of claims, inoperativeness, and noninfringement." He held there was no infringement, and from decree accordingly plaintiff appealed.

Pennie, Davis, Marvin & Edmonds, of New York City (William H. Davis, of New York City, of counsel), for appellant.

W. Clyde Jones, of New York City, Arthur B. Seibold, of Chicago, Ill., and R. H. Van Nest, of Niagara Falls, N. Y. (Everett N. Curtis, of New York City, of counsel), for appellee.

Before HOUGH, MANTON, and MAYER, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). [1] We pass without discussion or decision the question whether the method claims of this patent are anything more than descriptions of a function of the mechanical device disclosed. In a steadily growing art, the laudatory epithets bestowed in the cases cited above upon the device of using the back voltage of the battery to stop overcharging seem now rather out of place. Systems of lighting substantially along Creveling's suggestions obtained extended use, and this record displays unanimity among practical men, that for reasons arising especially from the rough passage of cars over frogs, switches, and the like, the stop charge relay "went off" too soon.

It is plain that this was the very real problem to which the patentee addressed himself. He solved it, to put the matter most favorably for him, and as it is put by very able counsel, by combining the potential control commonly used in 1908 in train lighting, with the ampere hour meter control already known and used in stationary plants. It is observable that Mr. Kennedy nowhere uses in his specification the term "ampere hour meter"; possibly because "ampere hour" is a term of art, meaning a certain unit of electricity, and a meter for ampere hours must mean something capable of measuring and indicating such units. He speaks only (in the claims quoted) of a "mechanism" or a "traveler."

The language chosen was careful; for as above shown, and admitted by plaintiff's expert witness, the "mechanism" of the patent only registers and reports how many units (called ampere hours) ought

to be in the batteries, assuming that the generator is giving (when it .gives anything) a steady volume of 30 amperes, or other precalculated ·quantum. As a meter, the device (and none other is suggested) somewhat resembles a water meter, which will tell how many gallons there are in a tank, fed by a pipe assumed to give a steady flow, and de- ·pleted by turncocks assumed to pass· a certain amount of liquid. Such .a device is not a meter; it has no means of ascertaining and disclosing whether the assumptions are true.

The basic difference between the mechanism of the disclosure and a true meter or measurer of amperage is that the former has no member responsive to the actual battery current; it never knows what that current is doing or has done; it can only state the result of the assumptions regarding in-put and out-go which are the law of its being. The defendant's meter is a true ampere hour measurer, responsive to the current, and indicating actual and not assumed conditions.

Applying the foregoing to the claims, the patentee's "traveler" does ·not "move a distance proportional to the charge in the battery"; it ·only moves a distance determined by the charge that ought to be in the battery, ·if the generator, etc., have been functioning as expected. But his "mechanism" does render the "controlling device inoperative until the battery has been charged to a predetermined number of ampere hours," in the sense that it delays the operation of what is essentially a "stop charge" until the battery ought to be full, and if it is not (though the indicator says it ought to be) the control will not oper- .ate until the predetermined back voltage is reached. The defendant is right in calling this mechanism a "time-delay device."

It is no longer necessary to multiply citations to show that claims are to be construed in the light of the contribution to knowledge ac- ·tually made by the inventor, or that mere ability to fit to a thing the ·words of a claim does not prove infringement. Let it be assumed that (e. g.) the first claim, at least, will "read on" defendant's system; it remains to inquire whether that (and other) claims, construed consistently with the patentee's actual achievement, justify the finding that there has been that substantial appropriation which is always the es- ·sence of the tort known as infringement.

[2] Even the broadest or most loosely drawn method or combination claim, must be fortified by a disclosure of how the method is to ·be practiced, or· of the kind and nature of the elements combined. The method proposed by this inventor for supplying current to battery "for a predetermined number of ampere hours" leaves the ultimate de- ·termination of the proper battery quantum to two circuit-controlling ·devices"—i. e., relays—both of which are fundamentally dependent for activity on the counter e. m. f. of the charge battery; the sole inventive thought revealed by the disclosure is to delay that action for a time that can be properly expressed in ampere hours only if the generator is working smoothly and delivering its product at a precal- ·culated rate.

[3] The combination disclosed, when not limited to a constant current system (as in claim 3), requires as one element (claim 7) "mech- .anism responsive to the current flowing in the battery circuit to move

the traveler a distance proportional to the charge in the battery." It has been already shown that in no true sense does the traveler (indicating finger) do the thing claimed; but, assuming that the combination is good for what its elements will really co-ordinately accomplish, there can be no infringement, unless defendant's combination is of substantially the same elements functioning co-ordinately in the same way.

We fully agree with the court below that (to use the phrases of counsel) defendant's ampere hour meter is an element wholly different from plaintiff's time-delay device; consequently there is no appropriation of method or combination, and no infringement. Though in a much less important art there is a singular resemblance between this patent and that to Selden for an automobile. In that well-known instance, the "liquid hydrocarbon gas engine of the compression type," which was an element in Selden's combination, was a phrase as all-embracing as the "mechanism" of this one. Yet, where patentee plainly had only one type of engine (or "mechanism") in mind, varying the combination by employing an entirely different engine type was held to avoid infringement. Columbia, etc., Co. v. Duerr, 184 Fed. 893, 107 C. C. A. 215.

[4] The argument has been much pressed that Kennedy's disclosure reveals nothing useful, and is not operative. That it possesses no practical utility is fully proven. The scheme might be called one of hope or aspiration; but the device will operate in a laboratory at least, and we do not think the patent can be struck down as inoperative in the sense of the patent law. We find it true that no practical use has been made of this invention during the 13 years that have elapsed since specification filed. We continue to agree with the doctrine of Putnam, C. J., in Boston, etc., Co. v. Pennsylvania, etc., Co., 164 Fed. 557, 90 C. C. A. 84, as to the narrowness of interpretation to be awarded "paper patents"; but it is not necessary here to invoke that principle.

Appellant has presented objection to certain testimony admitted below. As our decision does not in the least rest upon that evidence, we do not discuss the matter; silence, however, is not to be regarded as decision in favor of admission.

Decree affirmed, with costs.