## DILLON CO. v. CONTINENTAL SUP-PLY CO.

### No. 1577.

Circuit Court of Appeals, Tenth Circuit.

July 27, 1938.

Edward P. Marshall, of Tulsa, Okl. (Robert E. Barry, of Washington, D. C., and J. J. D. Cobb, of Tulsa, Okl., on the brief), for appellant.

A. J. Hudson, of Cleveland, Ohio (Yancey & Spillers, of Tulsa, Okl., and Kwis, Hudson & Kent and S. J. Boughton, all of Cleveland, Ohio, on the brief), for appellee.

Before LEWIS, BRATTON, and WILLIAMS, Circuit Judges.

LEWIS, Circuit Judge.

On August 25, 1927, S. V. Dillon of Tulsa, Oklahoma, filed application for a patent of a device which he represented as new and useful improvements in pipe joints, and said in his specification that it would be constructed and arranged in such manner that the pipe gripped thereby will be positively prevented from slipping in either direction; that it provided a method of coupling pipes in either a rigid or flexible joint as different conditions may require. He said his invention was illustrated in accompanyng drawings. On January 20, 1931, patent No. 1,789,379 was issued to him containing twelve claims. Dillon transferred his patent by assignment to appellant, and it later sued appellee for infringement of claims 11 and 12. Dillon organized appellant company and is its president.

The answer alleged that the patent is void in view of the state of the art as known

at the time of and long prior to Dillon's alleged discovery; that it did not involve invention, but involved nothing more than the exercise of mere mechanical skill. It also denied infringement of either claim.

Appellant dismissed as to claim number 12.

The District Court found there was no infringement of claim 11 and dismissed the bill. In bringing the case up Equity Rule 70½, 28 U.S.C.A. following section 723, was not complied with in any respect.

Claim number 11 reads thus:

"The combination (1) with a plurality of pipes arranged end to end and having their extremities slightly spaced apart, (2) of a resilient sealing ring surrounding the pipe ends and having an internal groove communicating with the space between the pipe ends, said ring having inwardly extending sealing lips arranged at opposite sides of the groove and snugly engaging the peripheries of the pipes, (3) a housing mounted on the pipe ends and having a groove in which the sealing ring is seated, (4) and jaws movably mounted in the housing and having teeth biting into the peripheries of the pipes."

The history of the art prior to Dillon clearly shows that the spacing apart of the ends of pipes is for the purpose of avoiding the effect of expansion and contraction caused by changes of temperature. Also it was well known before Dillon that pipe lines sometimes creep and that creepage may pull a pipe out of a joint, it being far more extensive in movement than expansion and contraction. In the use of plain end pipes with their ends spaced apart even slightly it was apparent that there would be leakage at each joint, which would have to be prevented, as well as means of binding them firmly together as spaced, and these were the main objects of such a device, the whole being generally called a "pipe coupling". The first patent in that field disclosed in this record is a British patent issued to Kittoe and Brotherhood in July, 1870, in which the specification said:

"For the joints of pipes we employ the following construction:—We bring the two ends of the pipes to be joined into juxtaposition allowing a little clearance between them. We surround these ends by a cylinder of caoutchouc or other elastic material made with a cavity within its thickness, and an annular opening from this cavity on the inside, so that it is like a cyclindrical tube with its two ends folded within itself. We place this elastic cyclinder on the ends of the pipes so that its annular opening faces the clearance between the ends of the pipes, and we cover the elastic cyclinder by a metallic casing securing it externally and at each end. When the pipe so joined is charged with fluid under pressure this pressure acting within the cavity of the elastic cyclinder tightens it against the pipes and the casing, while the casing prevents it from being too much expanded or rent."

In Bodart, No. 210,906, for pipe joint and coupling, issued December 17, 1878, it is stated in the specification:

"The object of this invention is to furnish a strong and close union of pipes for gas and water supply, and for other purposes, without the use of sockets or flanges on the pipes, and that will allow for the expansion and contraction thereof. * * *

"A coupling formed in this way enables straight pipes without sockets to be used, and makes a perfect union between the pipes, as strong and tight as may be desired, but sufficiently flexible to yield to the expansion and contraction of the pipes."

Other patents in the record in line with what has been quoted from those above named are: Duncan, No. 591,828, issued October 19, 1897; Register, No. 1,571,343, issued February 20, 1925; and Tribe, No. 1,541,601, issued June 9, 1925.

The ring "with a cavity within its thickness" and an opening from this cavity on its inside encircling the pipes at their ends and held in position by the housing, is called a sealing ring or gasket. Appellant calls for a sealing ring in its patent, but it functions in a very different way and is actuated by different means from that in appellee's combination. Appellant presses the lips of its gasket tightly against the peripheries of the pipes adjacent their ends with its housing, as shown in patent drawing Fig. 6, which encircles the pipes and gasket, and in Fig 1 Dillon presses the gasket on one pipe by a clamp in the end of the housing, but on the other pipe by the housing. There is no connection, physical or operative, between the clamp and housing in Fig. 1 or between the clamps and housing in Fig. 6, whereas appellee uses pressure from the pipe content to press the lips of its gasket against the peripheries of the pipes. The first method is mechanical, the second automatic.

The third element in the combination, a housing over the pipe ends to hold them together and the gasket in place is the real coupling means. Such means appear in prior patents, some of which expired prior to Dillon. In some of the prior patents, when plain end pipes spaced apart were used, the housing and gasket around the pipe ends constituted the whole structure, called a pipe coupling,—and were an invented device or means to prevent leakage as already described.

We come to the fourth element of the combination, "jaws movably mounted in the housing and having teeth biting into the peripheries of the pipes". Relative thereto appellant's brief states:

"The patent discloses inventions relating to two types of coupling principle: (a) one device for effecting a rigid joint between the pipes, and (b) another device for effecting a flexible joint. It is to the latter principle and invention that our inquiry is addressed."

It is further said in the brief the coupling thus improved is applicable to plain end pipe, that it would allow for relative longitudinal movement, such as for expansion and contraction of the pipes themselves, or creeping and otherwise for flexibility of longitudinal movement; that it was to provide a means of keeping the ends of plain end pipes from being withdrawn from the sealing ring or housing as a consequence of movement of the pipe ends away from each other, and this was to be accomplished by placing movable toothed jaws in recesses in either end of the housing to bite into the peripheries of the pipes; and that these functions of the invention as set forth in the claims may be readily recognized in Fig. 6 of the patent drawings. The brief admits that prior to Dillon there were couplings for plain end pipes embodying sealing rings or gaskets which sealed the joints between pipe ends against outleakage of pipe content, such as found in patents to Stuttle, Register, Kittoe and in the Dresser coupling, but none of these devices had any means whatever for preventing the pipe ends from being slipped, pulled or otherwise disengaged from the coupling proper, or from the gasket within the coupling, but it is admitted that Victaulic coupling (patent issued to Tribe preceding Dillon) provided for such pipe movement and prevented disengagement from gasket or coupling.

Figs. 1 and 6 of the Dillon patent drawings are reproduced, viz.:

The pipes are marked x and spaced apart. The gasket 17 lies around the pipes at their ends, V-shaped over the pipe opening, its apex fitting into a groove in the housing 2 and 3, and when the two parts of the housing are clamped down in Fig. 6 it compresses the gasket tightly on the ends of both pipes, whereas in Fig. 1 it compresses the gasket only on the right hand pipe, and the teeth in its jaws bite only into that pipe. When the clamps in Fig. 6, which also surround the pipes, are clamped down the teeth in those clamps bite into the pipes. As to Fig. 1 the specification says:

"The gasket 17 may be integral or in sections, composed of rubber, soft metal or any other suitable material and is of sufficient thickness to engage the pipe slightly in advance of the teeth 6 and 12, whereby when said teeth are drawn together, said gasket will be pressed against the pipe to such an extent that a leak would be impossible. * * *

"In Figure 6 I have shown another type of flexible joint which may be used as effectively as the one heretofore referred to. With this construction, instead of providing the housing with teeth or jaw members, I employ a gripping clamp 8 at each end there-

of, said clamp being slideably mounted within recesses 7 in said housing. In this structure the gasket 17 is secured entirely by the housing 1."

It was the conception of Dillon that his two clamps, one in each end of the housing as shown in Fig. 6, each of which had two jaws surrounding a pipe, each of those jaws carrying teeth, would when clamped down firmly grip a pipe and cause its teeth to bite into it and ride on the pipe to the extent of the recesses surrounding those clamps and until it reached a wall of the housing and thus a flexible coupling would be attained. The two parts of the housing would have no function to perform that is attributed to the clamps. It is said that in this structure the gasket 17 is secured entirely by the housing 1. Obviously in a device made in accordance with Fig. 6 of the patent the jaws of the housing were to hold the ends of the two pipes in place as spaced and press the gasket firmly on the two pipes. The teeth carried by the jaws of the clamps, also called gripping rings, were rigidly held by the jaws of those clamps. They were not movably mounted as were the gripping rings in appellant's exhibit 4 which will have further notice.

Appellee's device is known as Champion "77" pipe coupling. The record (pp. 90, 91) displays a drawing and a photograph of it which we reproduce here.

the inner side of the gasket which faces the opening between the pipes. That open space is not as wide as the entire cavity in the gasket. The gasket has free sides or edges, called lips, on the sides of the open space leading into the cavity of the gasket, and the pipe content being driven into the gasket in turn exerts pressure on the two lips and holds them tightly against the peripheries of the two pipes, thus sealing the line at that joint against leakage. Two grooves, one on either side of the groove for the gasket, may be seen which contain steel rings with sharp upstanding edges which bite into the pipes when the housing jaws are clamped for the purpose of preventing pipe movement out of the gasket and housing. These gripping rings are so seated in the grooves and the grooves are so formed at their base that their grip of the pipe is intensified if it is moved or pulled outwardly of the gasket and housing. Thus the rings holding their grip move to a limited extent with the pipe, which it is said causes a flexible joint.

After Dillon's application was filed in 1927 he made many experiments covering his claimed improvements. He was the only witness for the plaintiff. He made up a number of forms which were introduced in connection with his testimony, marked as exhibits at the trial. He testified:

The drawing shows the ends of the pipe spaced apart. The photograph shows the two semicircular parts or members of the housing with bolts and nuts to close them over the gasket and over the pipe ends. The gasket is standing in the groove in the housing member that contains the bolts. The groove in the other member for its reception may be seen. An open space may be seen in

"Following the filing of application for the Dillon patent we manufactured pipe couplings in substantial exemplification of Fig. 6 of the patent drawings."

He said that he thought the housing of his experimental exhibit number 4 was manufactured in 1927; that originally "plaintiff's exhibit 5 had solid jaws"; that he was making a test to find out what jaws

biting into pipes would do; that he didn't know what it would do; that in that way he could determine by tension test on two plain end pipes how much pull it would take to pull the pipe out of the coupling; that he found he had so much strength or what he thought was so much strength that it wasn't necessary to make the groove (in the housing of exhibit 4) entirely surrounding the pipe, so he then devised a way of getting better leverage; that he got that by rockable jaws shown by plaintiff's exhibit number 6; that those joints will allow for the movement of pipe a predetermined distance. He found the hardest thing was to take care of contraction. The pipe would pull apart. When it was expanding it would dovetail. When the pipe would pull apart and dovetail in expanding they would peen those in initially to take care of the maximum of contraction and in shortening the jaws instead of cutting all the way around they could furnish a higher grade of steel and afford to put on a special process to combat corrosion, and as the diameter of the pipe increased they would increase the number of jaws in proportion to the diameter; that exhibit number 5 is one of the first designs of pipe couplings manufactured by Dillon to prove out the idea of gripping jaws on two plain end pipes; that he manufactured a pipe coupling providing for a sealing ring in the housing and movable jaws at either extremity of the housing about 1929 such as would be exemplified substantially by plaintiff's exhibit number 6. Tests made with plaintiff's exhibit number 5 indicated that the jaw members on either side of the coupling housing could be shortened and did not have to be constructed to extend the jaws completely around the circumference of the pipe. After the design exemplified by plaintiff's exhibit number 6 was prepared it was manufactured and marketed. Exhibits 4 and 5 are alike. Each exhibit has a housing consisting of two like semicircular parts, called jaws, to be put around the pipe ends and clamped down by nuts and bolts. They differ only in that the gripping rings in number 4 with sharp edges in contact with the pipe are slightly movable with the pipe, whereas in number 5 the teeth are integral with the housing jaws and are not movable. Exhibit 4 is therefore said to be a flexible joint and exhibit 5 a rigid joint. Mr. Dillon further testified:

"Plaintiff's exhibit number 4 is just the same as Fig. 6 in the Dillon patent. Plaintiff's exhibit number 4 corresponds with Fig. 6 of the Dillon patent, in that it has the jaws extending around so that they could bite into the peripheries of the pipe, movably mounted. The jaws are set in the housing in a groove therein provided for their reception. Between the jaws the further groove in the housing about the central part of it is designed for a resilient sealing gasket to perform the function of a sealing ring as previously stated, and to fit over the ends of the pipes as they fit together. Plaintiff's exhibit number 4 shows the jaws movably in the casing housing designed to engage the peripheries of the pipe near the end and that corresponds to the picture described as Fig. 6 of the Dillon patent drawings. Plaintiff's exhibit number 4 is merely a model of the housing design shown in Fig. 6. We never manufactured and put in commercial production the plain end housing containing these movable jaws and the sealing ring, according to the design shown by plaintiff's exhibit number 4. Exhibit 6 does, however, show the design that was manufactured and produced and sold by our company commencing about 1929."

On a question by the court the witness testified that what they really manufactured was plaintiff's exhibit number 6. The witness throughout his testimony calls what we have designated as rings with sharp upper edges seated in the housing and surrounding the pipe end jaws. Characterizing these rings as jaws seems inconsistent with his specification. On page 1 of his specification he spoke of his clamps in the ends of his housing as having jaws and on page 2 in referring to Fig. 6 he spoke of his housing as having jaw members. But the patentee was still not satisfied with the rings that extended all the way around in his exhibits 4 and 5. He further testified: "In plaintiff's exhibit number 4 the jaw extends entirely around the circumference of the pipe as distinguished from spacing at intervals in the other exhibits 6 and 7." (He apparently meant the sharp edged rings supposed to cut into the pipe. By jaw he again referred to these rings.) He constructed other housings, added thereto on either side, integral with it, extensions that would accommodate what are like short segments of the rings he had in the housing in his exhibits 4 and 5 and placed them in these extensions so that they would press against the pipes when the jaws of the housing were clamped down. They were equal in number on each side of the housing, depending on the size of the pipe, so that they were directly op-

posed to each other across the circumference of the closed jaws of the housing, and in that relative position were more firmly clamped by closing the housing jaws against the pipe. In his testimony he called these extensions jaws. He said: "On either side of the housing it provides six jaws (that number being for an eight inch coupling) instead of a continuous biting jaw all the way around." He had entirely dispensed with the two clamps in the ends of his housing. For a six inch pipe four extensions on each side of the housing were used. Mr. Dillon further testified:

"In all these exhibits which I have referred to, with the exception of plaintiff's exhibit number 5, jaws movably mounted in the housing are disclosed, adapted to biting into the peripheries of the pipe and movably mounted when fitted onto the peripheries of the pipe, and adapted to allow for longitudinal pull or contraction within the coupling, without breakage or distortion of the sealing effect of the rubber sealing ring or gasket."

Again the witness characterized the sharp edged metal rings as jaws. He further testified:

"Exhibit 4 is an exhibit that I have prepared for the purpose of this suit; it wasn't an actual manufactured product in the sense of our selling it. We never sold the construction of exhibit 4 precisely, or precisely that of Fig. 6. I don't show the gaskets we used in Exhibit 4. * * * That was the form of gasket which was initially used in connection with exhibit 4. At the time it didn't have these rings that I have in there now; those gripping rings. * * *

"When we used this gasket that would fit in such a coupling as exhibit 4, it didn't have those grooved rings in it. We made the castings back in 1927 and we made the jaws in there, as I say, solid. We put these rings in recently. Since we have been in production we have changed from the type of gasket shown in Fig. 6 of the Dillon patent to another type, such as exemplified in the part that forms plaintiff's exhibit number 6. * * *

"A coupling like exhibit number 6 is the one that I contend from my side of the case comes under the patent in suit and exhibit 4 is an example of it. I contend that exhibit 6, or those that are like it, and exhibit 7 and so on are the commercial form of our patent that is here in suit. I got a separate patent on this pivoted dog. I applied for that subsequent to the patent here in suit. Dillon patent 1,930,134, issued October 10, 1933, is the patent that I got relating to the pivoted dog structure."

What the witness refers to as pivoted dog structure consists of short segments of strips of steel having sharp upturned edges carried in metal blocks about a half inch long and three-eighths inch in width and depth, the whole body of said blocks extending beyond and overhanging the sides of the jaws of the housing, but made with and integral parts of the housing jaws. These short segments of sharp steel rings pivoted in these blocks and slightly movable are intended to perform and do perform the same function as the encircling gripping rings in plaintiff's exhibit 4.

A witness for appellee testified that expansion and contraction of iron pipes is an irresistible force causing movement during which their lengths vary, due to changes of temperature, to approximately 10/64 of an inch in a twenty foot pipe, and in other lengths proportionately. No cause was assigned for creepage nor was it said to be irresistible, but it was said the extent of movement might be much greater than in expansion and contraction. In the patent issued to O. E. David April 10, 1906, No. 817,300, he dealt with the prevention of creepage. In his specification, page 1, line 3, he says:

"The teeth m' of the jaw are pressed firmly into engagement with the pipe, and any creeping of the same in the sleeve will carry the beveled face of the jaw against the oppositively-beveled face of the recess and serve to press the jaw more firmly against the pipe, effectually stopping the creeping."

Again at line 97 he says:

"And it will be seen that the coupling is one in which there can be no creeping of the pipes because of the toothed jaws M, which bite into the pipe and hold the sleeve against any movement whatever."

On page 1 he says:

"The object of my invention is to produce a pipe-coupling which will prevent the pipes creeping in the couplings and one which may be easily disconnected."

Tribe's patent for new and useful Improvements in Pipe Joints was applied for July 7, 1919, and it issued June 9, 1925. It was assigned to Victaulic Company Limited. He said in his specification:

"This invention relates to pipe joints, and has reference to pipe joints where in-

ternal pressure is utilized to maintain the joint leakproof. The invention has for its object to provide improved means whereby lengths of pipe can be expeditiously connected together and when so connected will remain leakproof under all pressure conditions. * * *

"my invention being such that ordinary plain pipes can be arranged end to end and connected together. * * *

"My invention also contemplates means for retaining this leak-preventing ring in position, and means for positively preventing relative longitudinal movement of one pipe relatively to another. * * *

"Fig. 6 shows a joint adapted to withstand great pressure wherein means are provided for retaining the leak-preventing ring in position and preventing relative longitudinal movement between the pipes. * * *

"In order to prevent any longitudinal movement of one pipe relative to its adjoining one, the retaining ring 7 may be provided with flanges 9 adapted to engage in grooves 10 in the ends of the pipes. * * *"

The first claim is for a ring or gasket for forming a leak-preventing joint between the adjacent ends of two pipes as a unitary structure. The remaining eight claims are for combinations, more than one of them having this element:

"a multiple part housing encasing the body portion of the ring, said pipes and housing being provided with interengaging flanges and grooves for locking the pipes against substantial longitudinal movement with relation to each other * * *."

This, we think, requires the whole housing to move with the longitudinally moving pipes. Appellant's gripping device permits pipe movement only to the extent of the recesses surrounding the clamps, which might be sufficient for expansion and contraction, but not for creepage. Furthermore, the subject of pipe movement on this record is more theoretical than practical. Not one instance in the entire Mid-continent field was cited.

The fourth element in appellant's claim 11 is also clearly a part of the prior art. Dillon was familiar with the Victaulic coupling. He carried tools for making the grooves in the ends of the two pipes and offered them for sale, and he sold pipes with those grooves in them. He manufactured and sold couplings with flanges that rest in the grooves in the ends of the pipes, but he did not use a gasket like the Victaulic gasket. A witness for defendant testified:

"I have been continuously identified with the sale of Victaulic couplings since 1926. * * * That coupling allows for expansion and contraction. It is accomplished through the widths of the groove in each piece of pipe. In the key section or lips, commonly called, which are smaller than the width of the grooves which permit the two abutting pieces of pipe to move backwards and forwards due to changes in temperature", without breaking the seal of the joint.

"Referring to page 6 of this folder, which is exhibit E (Victaulic sales folder) and to the two illustrations at the bottom of the page, they essentially represent the matter of expansion and contraction in that joint I have spoken of. * * * The sale of Victaulic couplings has been continuous; that is I mean the offering for sale and the selling since I started selling these in 1926. They have been sold in large quantities. They have gone into use in the oil fields."

The witness speaks only of expansion and contraction, but we see no reason why the pipes and housing would not move together as one in the event of greater movement by creepage as long as the pipes were locked by the housing.

■ Dillon filed application for the patent in suit August 25, 1927. Up to the time of trial of this case in May, 1936, neither Dillon nor his assignee nor anyone by their consent during those nine years had used, made or sold a patented device constructed in accordance with his specification, claims and patent drawings. That has been said to render the patent a mere paper patent, entitled to a narrow interpretation when thereafter sued on for infringement. Deering v. Winona Harvester Works, 155 U.S. 286, 295, 15 S.Ct. 118, 39 L.Ed. 153; Boston Woven Hose & Rubber Co. v. Pennsylvania Rubber Co., 1 Cir., 164 F. 557; Henry v. City of Los Angeles, 9 Cir., 255 F. 769; Electro-Dynamic Co. v. U. S. L. & H. Corporation, 2 Cir., 278 F. 80; National Malleable Castings Co. v. Buckeye M. I. & C. Co., 6 Cir., 171 F. 847. Dillon testified that after application he experimented with devices, made different models of pipe couplings, and manufactured and sold a device according to his models represented by exhibits 6 and 7, which were introduced in evidence by appellant. There is no proof that these exhibits and many others that he made up

from his experiments were ever presented to the Commissioner of Patents and requests made that the application be amended.

We have pointed out the difference between Dillon's gasket, physically and operatively, from the gasket used in the claimed infringing device. There is a marked difference between them also in the gripping rings. Relative the gripping rings in patent drawings Figs. 1 and 6, they are integral the jaws of the clamps and extend entirely around the pipe. They grip it when the clamp is closed down, but they do not move back and forth as they do in the alleged infringing device. In it there is a groove in each half-circle of the jaw. In that groove there is a strip of steel carrying these gripping rings with upturned sharp edges. They are immovably fixed except they move slightly back and forth, being a part of the strip of steel that fits into the groove. It wasn't necessary that Dillon's gripping rings in his patent clamps should have a separate moving action and bite firmly into the pipe because the clamp itself was attached to nothing but the pipe by its own jaws, and it would move when the pipe moved in either direction across the recess provided. But Dillon as a result of his experimenting wholly eliminated his clamps in Figs. 1 and 6 of the patent drawings and put these gripping rings in the jaws of his housing and made them slightly movable just as they are made movable in Champion "77". Dillon says however, if we properly construe his contentions, that the movable gripping rings in the accused device of defendant is an equivalent to his immovable gripping rings in the Dillon patent.

The prior state of the art should always be considered in an infringement case. If it is crowded as here, the patent sued on should be narrowly interpreted. Also the character of the claimed improvement. The rule was well stated by the late Walter H. Sanborn in P. H. Murphy Mfg. Co. v. Excelsior Car-Roof Co., 8 Cir., 76 F. 965, 972:

"The claims and specifications of every patent must be read and construed in the light of a knowledge of the state of the art when it was issued. A patent to the original inventor of a machine or construction, which first performs a useful function, protects him against all machines and constructions that perform the same function by equivalent mechanical devices. But a patent to one who has simply made a slight improvement on devices that perform the same function before as after the improvement is protected against those only which use the very improvement he describes and claims, or mere colorable evasions of it."

Judge Faris, speaking for the Eighth Circuit Court of Appeals in Anakin Lock Works v. Dillon Lock Works, 292 F. 45, put the rule in these words (page 47):

"in case of a patent involving mere improvements, in view of the prior art, the claims are to be narrowly construed and limited to the particular mechanism described, and any device which accomplishes the same result by means of different mechanism is not an infringement."

See, also, Hardison v. Brinkman, 9 Cir., 156 F. 962. In Rich v. Baldwin, Tuthill & Bolton, 133 F. 920, the Circuit Court of Appeals for the Sixth Circuit said this (page 924):

"As we have several times had occasion to say, and what is indeed well established in patent law, the term 'equivalent' has a variable meaning, and is measured by the character of the invention to which it is applied. [Citations.] Different means for moving the rolls by power directly applied existed. Rich saw one of them. The defendants found another. We could not give such breadth to the Rich patent as is claimed for it without giving him a monopoly of all means capable of effecting the result which was the object of his invention. His patent does not confer so extensive a right."

The decree appealed from should be affirmed. It is so ordered.